UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Cr. No. 21-686 (FYP) |
| ) | |
| NATHAN WAYNE ENTREKIN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

### SENTENCING MEMORANDUM

Mr. Nathan Entrekin, through undersigned counsel, respectfully submits this memorandum requesting that this Court consider his entire life in determining a fair and just sentence.

### BACKGROUND

On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the results.[1]  The rally was set for January 6, 2021, the same date Congress was set to certify Joe Biden as the winner.  On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's start.[2]  A number of speakers took to the stage, including some high-profile figures in the Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start

---

[1] President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!"  *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

[2] Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

taking down names and kicking ass."[3] Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4] Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5] Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6] Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are all watching."[7] Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[8]

Finally, around noon, President Trump took to the stage. For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk

---

[3] See Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[4] Id.

[5] Id.

[6] Id.

[7] Id.

[8] Id.

down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[9]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10] At approximately 12:50 p.m., those same attendees breached the outer barricades of the U.S. Capitol grounds.[11] The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[12] The MPD arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West. But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[13]

When President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol. By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building. Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the

---

[9] *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10] *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[11]   *Id*.

[12]   *Id*.

[13]   *Id*.

3

Northwest side of the building.  This breach spurred the evacuation of members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[14]

       Following the building's breach, Mr. Entrekin entered a door entryway at approximately 2:57 p.m.  For approximately four minutes, Mr. Entrekin was inside the building where he took a video as he walked through the crowd and then exited the building.  Then, for about six minutes he remained on the plaza and took more photographs and videos.  At about 3:07 p.m. he reentered the building and remained inside for approximately nine minutes.  In total, Mr. Entrekin was inside the building for thirteen minutes.

       On February 2, 2021, at his residence, Mr. Entrekin met with the F.B.I. and admitted to being inside the U.S. Capitol on January 6, 2021.  *See* Statement of Offense, ECF #23, pg. 5.  Approximately five months later, a warrant for his arrest was issued on July 14, 2021, pursuant to a criminal complaint that was filed in U.S. District Court for the District of Columbia charging Mr. Entrekin with five misdemeanor offenses.  *See* ECF #1 & #5.  On July 15, 2021, Mr. Entrekin was arrested in Cottonwood, Arizona, and detained for five days.  *See* PSR, Release Status, pg. 1.  On July 20, 2021, Mr. Entrekin was released in the District of Arizona and ordered to appear virtually before Magistrate Judge Harvey on July 23, 2021.  *Id.*  On July 23, 2021, he appeared as directed and was ordered released.  *See* ECF #8.

       On November 18, 2021, an Information was filed charging him with Count One, Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Count Two, Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. §

---

[14]    *Id.*

1752(a)(2); Count Three, Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C); Count Four, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Five, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  *See* ECF # 11.

On January 14, 2022, this Court accepted Mr. Entrekin's guilty plea to Count Five of the Information, and scheduled his sentencing for April 22, 2022.  *See* Minute Entry, 1/14/22; and ECF #22-23.  Thereafter, this Court rescheduled the sentencing hearing to May 6, 2022.  *See* Entry, 4/15/22.

## **ARGUMENT**

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense," as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less.  The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors.  *See* U.S.S.G. §1B1.9.  Additionally, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment, 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow.  *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Because the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how

5

a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id*. at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2(B-D). Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

    I.    <u>**Nature and Circumstances of Mr. Entrekin's Offense**</u>

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained $1.4 million in property damage. Five individuals lost their lives.[15] And because of the breach, the 2020 Presidential Electoral College count was delayed. All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost friends, and some lost confidence in the American political system's ability to defend against threats to the peaceful transfer of power.

However, Mr. Entrekin was not the cause of January 6, nor was he in the classification of people that caused physical harm to the Capitol or others. He entered the building, but his

---

[15] Ashli Babbitt was killed after she refused to comply with police commands. Kevin Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions while in the crowd. Rosanne Boyland was crushed to death. Officer Brian Sicknick died the day after, from injuries that appear related to his service on January 6. *See* Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. Additionally, the former president, the rally's organizers and speakers, and nefarious, organized groups contributed to the chaos. The American system of justice, and specifically 18 U.S.C. § 3553(a), directs the Court to look at every defendant and every defendant's actions individually. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

On January 6, Mr. Entrekin, upon the urging of President Trump, traveled from Arizona to Washington, D.C., to protest the results of the 2020 presidential election. After hearing the president's speech and heeding his call for supporters to "walk down Pennsylvania Avenue," Mr. Entrekin marched with thousands of others to the Capitol building. By the time he arrived, many of the outer barricades and bicycle racks used by officers to cordon off the Capitol grounds were displaced.

To be clear, Mr. Entrekin played no role in organizing the January 6 rally, nor did he deliver inciting and aggressive commentary to the already energized crowd. He urged no one to "kick[] ass," "go after [politicians]", "punch back from Donald Trump" or engage in "trial by combat." Additionally, Mr. Entrekin did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner doors or windows of the U.S. Capitol. He did not damage or steal any property while inside. He, at no time, assaulted or threatened law enforcement. Instead, Mr. Entrekin's offense conduct that day consisted of him unlawfully assembling at the U.S. Capitol, walking through an already breached door, and walking through the U.S. Capitol unlawfully while taking photographs and videos.

II. **Mr. Entrekin's History and Characteristics**

Born and raised in Mesa, Arizona, Mr. Entrekin is 49 years old and resides in

7

Cottonwood, Arizona.  He graduated high school in 1991; received his Associate of Arts in Communication Graphics in 1998 from Pima Community College in Tucson, Arizona; received his Bachelor of Arts in Fine Art Studies in 2001 from University of Arizona; and thereafter received his Maters of Education in Educational Technology with Distinction from Northern Arizona University in 2013.  *See* PSR ¶ 60, pg. 15.

Mr. Entrekin has never been married and does not have any children.  *See* PSR ¶ 46, pg. 13.  Currently, Mr. Entrekin resides with his mother, with whom he shares a close relationship and assists her with her medical issues and daily living requirements.  *See* Exhibit – letters in support of Mr. Entrekin, pg. 1.

For the past twenty years, Mr. Entrekin has been employed in a variety of positions involving IT Tech support, substitute teaching, graphic design, support services, ridesharing, freelance graphic arts, and most recently as a notary public.  See PSR ¶ 64-73, pgs. 15-16.  However, since his arrest in this case, his employment as a notary has been impacted due to the pending offense conduct.  *See* PSR ¶ 73, pg. 16.  Therefore, Mr. Entrekin respectfully submits the additional collateral consequences of his actions and his involvement in the events of January 6, 2021, should be considered by this Court in determining a reasonable sentence.  Notwithstanding his participation in the events of January 6, 2021, and the employment setbacks he has endured, Mr. Entrekin continues to help his neighbors and community.  *See* Exhibit, letters in support of Mr. Entrekin, pg. 3.

In addition to the letters of support, Mr. Entrekin also submits a letter to this Court to express his remorse and his "inexcusable participation inside the Capitol building."  *See* Exhibit – letter by Mr. Entrekin, pg. 2.  Notably, Mr. Entrekin submits his

> "deepest regret and apologies for the tragic violence, destruction, injuries, and lawlessness of January 6, 2021 at the United States Capitol building. My going about

8

inside this consecrated edifice was unbecoming of the ancient character I had hoped to personally portray. The good example I had planned to uphold was, as a result, diminished, compromised, and sabotaged. If time could return me to the green grass of the large lawn to the west, beyond all barricades and steps, that should be the place I'd have stayed."

*Id*. at pg. 3.

### III. A Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Entrekin to probation would not contribute to an unwarranted sentencing disparity, but sentencing him to *anything other* than probation, might. Though many of the January 6 cases are unresolved, the Court can look to other sentencing judgments to gain a baseline. January 6 defendants in other cases who pled to the *exact* same criminal charge have received probationary sentences. See *United States v. Anna Morgan-Lloyd*, Crim. No. 21-164 (RCL)(36 months probation); *United States v. Valerie Ehrke*, Crim. No. 21-097 (PLF)(36 months probation); *United States v. Douglas Wangler and Bruce Harrison*, Crim. No. 21-365 (DLF) (both defendants sentenced to a two year term of probation); *United States v. Danielle Doyle*, Crim. No. 21-324 (TNM)(2 months probation); *United States v. Eliel Rosa*, Crim. No. 21-068 (TNM)(12 months probation); *United States v. Vinson, et al.*, Crim. No. 21-355 (RBW) (5 years probation); *United States v. Thomas Gallagher*, Crim. No. 21-041 (CJN)(2 years probation); *United States v. Jacob Hiles*, Crim. No. 21-155 (ABJ)(2 years probation); *United States v. Jonathan Sanders*, Crim. No. 21-384 (CJN)(3 years probation); *United States v. Sean Cordon*, Crim. No. 21-269 (TNM) (2 months probation); *United States v. John Wilkerson, IV*, Crim. No. 21-302 (CRC)(3 years probation); *United States v. Andrew Wigley*, Crim. No. 21-042 (ABJ)(18 months probation); *United States v. Jennifer Parks*, Crim. No. 21-363 (CJN)(24 months' probation); *United States v. Andrew Hatley*, Crim. No. 21-098 (TFH)(3 years probation); *United States v. Rachael Pert*, Crim. No. 21-139 (TNM)(2 years probation); *United States v. Esther

*Schwemmer,* Crim. No. 21-364 (DLF)(24 months probation); *United States v. Julia Sizer*, Crim. No. 21-621 (CRC)(12 months probation); *United States v. Jeffrey Witcher*, Crim. No. 21-235 (RC)(12 months probation); *United States v. Edward McAlanis*, Crim. No. 21-516 (DLF)(24 months probation); *United States v. Amy Schubert and John Schubert*, Crim. No. 21-587 (ABJ)(both defendants sentenced to 18 months probation); *United States v. Michael Quick and Stephen Quick*, Cr. No. 21-201 (DLF)(Michael Quick sentenced to 36 months probation and Stephen Quick sentenced to 24 months probation); *United States v. Brandon Nelson and Abram Markofski*, Crim. No. 21-344 (JDB)(2 years probation); *United States v. Anthony Mariotto*, Crim. No. 21-094 (RBW)(3 years probation); *United States v. Gary Edwards*, Crim. No. 21-366 (JEB)(12 months probation); *United States v. Andrew Williams*, Crim. No. 21-045 (DLF)(24 months probation); *United States v. Verden Nalley*, Crim. No. 21-016 (DLF)(24 months probation); *United States v. Kevin Loftus*, Crim. No. 21-081 (DLF)(36 months probation); *United States v. Kari Kelley and Zachary Martin*, Crim. No. 21-201 (DLF)(each sentenced to 36 months probation); *United States v. Thomas Fee*, Crim. No. 21-133 (JDB)(24 months probation); and *United States v. Joseph Zlab*, Crim. No. 21-389(RBW)(36 months probation).

Therefore, to sentence Mr. Entrekin differently than the above-mentioned January 6 defendants who pled to the same offense, would *lead to* an unwarranted sentencing disparity, in stark contrast to the factors dictated in 18 U.S.C. § 3553(a)(6). Importantly, like Mr. Entrekin, the above mentioned cases involved entry inside the U.S. Capitol, photographs and videos taken inside the U.S. Capitol, meeting with the F.B.I. voluntarily and admitting conduct, and voluntarily turning over phones to the F.B.I.

Therefore, Mr. Entrekin respectfully notes that while every case is different, a sentence of probation is appropriate. Mr. Entrekin respectfully submits that a sentence of incarceration

would serve no purpose other than excessive punishment during a pandemic, as the research suggests that incarceration does little to change a person's behavior.  See https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf

## CONCLUSION

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person.  But Mr. Entrekin, despite his presence within the crowd, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered.  He did not organize or incite the riot, nor did he physically harm any person or property.  And though Mr. Entrekin certainly deserves some punishment for his conduct, it must be weighed against his other history and characteristics, his individual actions on January 6, the non-incarceration sentences imposed on those who engaged in similar conduct, and his ability to timely pay restitution.  Considering these and other § 3553(a) sentencing factors, a one year term of probation and restitution in the amount of $500.00 is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Dani Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500