**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-686 (FYP)** |
| **v.** | : | |
| | : | |
| **NATHAN WAYNE ENTREKIN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nathan Wayne Entrekin to a split sentence of one-hundred and five days' incarceration followed by three years' probation, sixty hours of community service, and $500 restitution.

## I.   INTRODUCTION

Entrekin is a 49-year-old resident of Cottonwood, Arizona. On January 6, 2021, Entrekin was a rioter and active participant in the siege of the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars of property damage.[1]

Entrekin pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a split sentence of one

---

[1] According to the Architect of the Capitol, the Capitol Police, the House Chief Administrative Office, the Secretary of the Senate and the Senate Sargent at Arms, as of March 2022, the costs incurred total $2,734,783.14.

hundred and five days incarceration split with three years' probation along with sixty hours of community service is appropriate in this case because he: (1) entered the Capitol twice, despite being forced out the first time by police officers and after videotaping rioters looting the Senate Parliamentarian's office; (2) entered into at least two private office spaces—specifically the Senate Parliamentarian's Office (S132) and Oregon Senator Jeff Merkley's Office (S140)—during his two breaches of the Capitol; (4) filmed a video of himself in the NW Plaza, shouting at members of Congress, "Why can't you people just do what we want? Why do you gotta make it so hard? Why do you take our money and use it for nefarious purposes?"; (5) while he was in the Capitol, he provided narration to his videos—directed at his non-present mother—the reason he was there, stating, "We can't let Biden . . . to be our president. We can't . . . there's no way"; and (6) Entrekin has a criminal history which includes a non-violent conviction from 2000 where he served a three-year term of probation and a conviction for threatening and intimidating from 2015 for which he was sentenced to a split sentence of one hundred and five days incarceration split with a three-year term of unsupervised probation.

At this time, the government has uncovered no evidence that Entrekin personally engaged in violence or property destruction during the siege. The government does not view Entrekin's restraint in this regard as a mitigating factor since if Entrekin had engaged in those activities, the government likely would have presented felony charges to the Grand Jury. A defendant's engagement in or abstention from violence/destruction is therefore only of limited utility in the misdemeanor sentencing analysis.

The Court should also consider that Entrekin's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for

his actions alongside so many others, the riot likely would have failed. Here, Entrekin participated in a riot that succeeded in halting the Congressional certification. That, his multiple entries into the Capitol, and his forays into offices in that building renders a split sentence of one hundred- and five-days incarceration followed by a three-year term of probation and sixty hours of community service both necessary and appropriate in this case.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

*The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol that the parties agreed to as part of the Statement of Offense. ECF No. 23, ¶¶ 1-7. In doing so, however, the government in no way intends to deemphasize that each participant in a riot is part of that riot. As Judge Chutkan recognized, "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers." *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), ECF No. 32, p. 25. Judge Lamberth similarly wrote,

> Some of the rioters—now defendants in criminal cases—directly contributed to this violence by assaulting members of law enforcement or by planning, preparing, and facilitating this violence. Others, like Little here, did not directly assault officers. But even Little and those who engaged in this "lesser" criminal conduct were an essential component to the harm. Law-enforcement officers were overwhelmed by the sheer swath of criminality. And those who engaged in violence that day were able to do so because they found safety in numbers.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, p. 2. From the most mundane actions to the most violent, each rioter contributed directly and indirectly to the violence and destruction of that day, including Entrekin.

*Entrekin's Role in the January 6, 2021, Attack on the Capitol*

Entrekin drove by himself from Cottonwood, Arizona, to Washington, D.C. Entrekin admits that he did so to protest Congress' certification of the Electoral College. In a post from a

now inactive Twitter account, Entrekin announced his plans to dress up as Captain Moroni and attend the rally on January 6. The government's only intent in drawing the Court's attention to what he wore is because while parading, picketing, or demonstrating inside the Capitol, his chosen attire made him more easily identifiable. He also often referenced his costume and what that represented when he was speaking to others as his intent and motive for being there.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**









*IMAGES 1-4—(top left) A screenshot of Entrekin's now deactivated Twitter account from December 31, 2020, announcing his intent to go to Washington, D.C., on January 6, 2021; and three additional photographs of Entrekin dressed up as Captain Moroni taken on or near Capitol Grounds in Washington, D.C., on January 6, 2021.*

On January 6, 2021, at approximately 2:42 p.m., a group of rioters breached a fire door next to the Senate Parliamentarian's Office—referred to as the Parliamentarian's Door. The rioter who caused that breach did so by using a metal walking cane to break out one of the windows. As described in greater detail below, Entrekin participated in that breach by entering through the Parliamentarian's door at approximately 2:57 p.m. Various surveillance and open-source intelligence (OSINT) images and videos from around the time and at that location show that the way the rioters gained entry was through chaotic and violent throngs.



*IMAGE 5—An open-source intelligence (OSINT) map created by private citizens—known by their handles @ne0ndistraction and @sansastark525—and available at https://jan6attack.com/maps.htm. All time shown on USCP CCV screenshots are in Coordinated Universal Time (UTC), where, for example, 19:42 is equal to 2:42 p.m.*

***VIDEO #1*** [2]

*January 6, 2021, 1:55 PM* [3]

A video recovered from Entrekin's cellphone. At the time of filming, Entrekin appears to have been making his way up the Pennsylvania Walkway towards the Capitol.

**ENTREKIN:**   [*to another protester*] What happened? Pence? Oh, he did?

**PROTESTER #1:**   He's a sellout. He's selling out.[4]

**ENTREKIN:**   Okay we're pushing. Push! Okay, I'm sorry, I'm going to push you, we're pushing.

I'm here, Mom! This is my flag.

 

*IMAGE 6—A screenshot from a video recovered from the defendant's phone. The screenshot shows the flag that the defendant brought to the Capitol on January 6, 2021, and that the defendant referred to as the Title of Liberty. The red star on the map to the right shows Entrekin's approximate location at the time the video was recorded.*

---

[2] All video files will be submitted to the Court for its consideration prior to the Sentencing Hearing.

[3] Times are approximate and based on the names of the video files recovered.

[4] Based on the approximate time at which this video was taken, defendant and the unidentified protester are likely referring to the news that Mike Pence had recently released an official statement in which he stated that he would not interfere with the certification of the vote. See https://www.cbsnews.com/news/read-pence-letter-saying-he-lacks-authority-to-decide-election/.

**ENTREKIN:**    They're doing tear gas right, uh, in the front, into the crowd, and it's coming over here it looks like a little bit. We're trying to push, I'm sorry, let's push, are we pushing? Oh, we gotta be careful. Shit. Aw fu . . . Oh come on. I think we're . . . there's . . . We're packed pretty good in here.  There are so many people in here.

This is awesome.

**CROWD:**    [*cheering as an unidentified individual with a flag appears atop the north west inaugural scaffolding*]



*IMAGE 7—A screenshot from a video recovered from the defendant's phone. The screenshot shows the crowd cheering as an unknown individual with an American flag reached the top of the northwest scaffolding of the Inauguration Stage.*

| | |
|---|---|
| **ENTREKIN:** | Who is that, Ted Cruz? Ted Cruz? Who is that, Ted Cruz? I think it was just a dude, wasn't it? |
| **CROWD:** | [*repeating*] U-S-A! U-S-A! |
| **ENTREKIN:** | U-S-A! U-S-A, baby! Freedom! |
| **CROWD:** | [*repeating call and answer*] Whose house? Our house! |
| **ENTREKIN:** | Sorry, sorry, my arm's in the way. Are we going? Are we going? Are we going up? Are we going up? This is a good workout. Forward, forward, forward. |

### ***VIDEO #2***
*January 6, 2021, 2:30 PM*

A video recovered from Entrekin's cellphone. At the time of filming, Entrekin appears to have been at the top of the steps that lead under the NW Scaffolding and standing on the NW Terrace at a vantage point that allowed him to look out over the NW Lawn and the West Lawn.

| | |
|---|---|
| **ENTREKIN:** | I made it Mom. I made it to the top. Mom, look, I made it to the top, to the top here. Look at all the patriots here. Haha, if I can make it up that, anybody can. [*laughs*] Oh man. Look at all the patriots here. Patriots, patriots, patriots. Look at all the people, Mom. Look at all that down there. And the monuments over there, way over there. I gotta catch my breath here. Sorry. Haha. |
| | [*yelling to an unseen protester*] Captain Moroni! Same fight, same place, different time. 76 B.C.! |
| | I'm here for Trump. Four more years, Donald Trump! Our rightful president! |
| | I made it to the relative top, anyway. Oh my gosh, how many of us are here? Must be like, millions. Couple million, maybe. I keep running into trees, though. I gotta get this first, though, before my costume falls off me. Check this out, Mom. All those people. |



*IMAGE 8*—*A screenshot from a video (VIDEO 2) recovered from the defendant's phone. The screenshot shows the crowd as recorded by the defendant after he reached an upper level of the west side of the Capitol. The defendant estimated that there were one or two million protesters in attendance.*

| | |
|---|---|
| **ENTREKIN:** | Oh, wow. That's not bad. That might be a million. |
| **PROTESTER #2:** | Hey Caesar! |
| **ENTREKIN:** | Captain Moroni! |
| **PROTESTER #2:** | You look great man. |
| **ENTREKIN:** | Thank you! Sorry, I'm falling apart. I'm actually . . . |
| **PROTESTER #2:** | How'd you get up here with that sword, anyhow? |
| **ENTREKIN:** | I made it. I don't know how I made it. I went the hard way. Oh, man, I made it. |
| **PROTESTER #3:** | Well, the Rubicon just keeps getting wider and wider, eh? |
| **ENTREKIN:** | Yeah, this is Captain Moroni of the Book of Mormon. The same fight, same place, if you believe the Book of Mormon, the Nephites and Lamanites lived here . . . |

### *VIDEO #3*

*January 6, 2021—2:41 PM*

A video recovered from Entrekin's cellphone. At the time of filming, Entrekin appears to have been standing at the NW corner of the Capitol. Just out of frame to the right is the NW Plaza which has both the Parliamentarian's Door and Senate Wing Door breach points. Just out of frame to the left is the North Door breach point.

**ENTREKIN:**          Here comes the riot police, Mom.



*IMAGE 9—A screenshot from a video recovered from the defendant's phone. The screenshot shows a crowd gathering at the northwest corner of the Capitol.*

### _Four USCP Screenshots Showing What the Approach to the NW Plaza Looked Like at the Time Entrekin was on the NW Terrace_





**IMAGE 10** _and_ **IMAGE 11** _(top to bottom)—Screenshots from USCP CCV showing the West Lawn and West Plaza as they appeared on January 6, 2021, at 2:42 p.m., the approximate time that a group of rioters were breaching the Parliamentarian's Door._





*IMAGE 12* and *IMAGE 13*—Screenshots from USCP CCV showing the (top) Northwest Lawn, Pennsylvania Lawn, Northwest Terrace, and the north side of the West Plaza; and (bottom) the Northwest Terrace and Northwest Plaza as they appeared on January 6, 2021, at 2:42 p.m., the approximate time that a group of rioters were breaching the Parliamentarian's Door. The Parliamentarian's Door is indicated with a red arrow. The Senate Wing Door—the first breach point of the Capitol—and the two windows flanking it can be seen in the background just above the heads of the rioters.

### *VIDEO #4*
*January 6, 2021—2:45 PM*

A video recovered from Entrekin's cellphone. At the time of filming, Entrekin appears to have been making his way from the NW corner of the Capitol back towards the NW Plaza. Entrekin appears to have been enjoying the attention his costume was drawing and was speaking to those who would listen about how he was Captain Moroni, not Caesar, and why that was significant to his presence at the Capitol on January 6, 2021.

**ENTREKIN:**    Here we are again. That's the Capitol, right there. And I'm gonna start doing my thing now again. [*points to flag*] So, there we go.



*IMAGE 14—A screenshot from a video recovered from the defendant's phone. The screenshot shows the defendant while he was narrating events for his mother.*

As shown in the USCP CCV screenshots, approximately fifteen minutes after the Parliamentarian's Door was breached at 2:42 p.m., Entrekin entered the Capitol.





*IMAGE 15* and *IMAGE 16*—*Screenshots from USCP CCV showing Entrekin entering the Capitol through the Parliamentarian's Door at approximately 2:57 p.m.*

### *VIDEO #5*
*January 6, 2021—2:58 PM*
A video recovered from Entrekin's cellphone. At the time of filming, Entrekin had breached the Capitol for the first time. He narrates much of the mayhem and destruction he observes.

**CROWD:** [*alarms blaring*] [*repeating call and answer*] Whose house? Our house!

**ENTREKIN:** I'm inside. I'm inside. I'm inside the, I'm inside the Capitol now. [*joining in the chanting*] OUR HOUSE!

[*pans video to a male protester without a shirt*]

Hi! Oh shoot, it's wet over here. It's very wet. What happened in here? Oh my gosh.

[*repeating buzzing sound*]

**ENTREKIN:** What's that sound? Huh? Taser? That's a taser? What, a machinegun taser? Hahaha! Something's going on, they're pushing us back out. Some kind of machinegun taser or something. I don't know what the hell is going on. I want to go in here though.

[*enters Senate Parliamentarian's office*]

Oh shit. Oh Mom. I don't think you want to be here, Mom. I mean you do want to be here, but in spirit. Yeah, haha. Oh my gosh. Oh my gosh. What happened?



**IMAGE 17**—*A screenshot from a video recovered from the defendant's phone. The screenshot shows the interior of the Senate Parliamentarian's office at approximately 2:59 PM on January 6, 2021. An unidentified individual can be seen putting their feet on a desk and another unidentified individual can be seen standing close by.*

**ENTREKIN:**          Holy shit. Oh my gosh, they broke the . . . oh shoot, they looted. Oh shit. I gotta go. We gotta go, we gotta get out of here.



*IMAGE 18*—*A screenshot from a video recovered from the defendant's phone. The screenshot shows the interior of the Senate Parliamentarian's office at approximately 2:59 PM on January 6, 2021. Several unidentified individuals and an American flag can be seen outside of a broken window.*

**ENTREKIN:**          We gotta go. Oh shit. We gotta, we gotta go. Rubber bullets, rubber bullets. Shit! Can we get out that way? No? Oh shit. Oh shit.

C'mon you guys, c'mon you guys. We got faith in you. I have faith in you. Press it out, press it out. Let us out you guys. Press it out. C'mon. Stay calm. We got it, we got it, we got it. Stay calm guys. Don't worry, we got it. We're coming out, we're coming out. Stay calm. We're moving, we're moving. Stay calm back there. Stay calm. Good job, guys, good job.

[*alarms blaring*]



*IMAGE 19—Screenshot from USCP CCV showing Entrekin exiting the Capitol through the Parliamentarian's Door at approximately 3:01 p.m.*

## **_VIDEO #6_**
*January 6, 2021—3:01 PM*

A video recovered from Entrekin's cellphone. At the time of filming, Entrekin was once again in the NW Plaza, having been pushed out from that breach point by other rioters. Even though just moments ago he had expressed high levels of distress and dismay at the destruction and mayhem he saw, in the Parliamentarian's Office, before he even reached the exit, he was back to smiling and taking videos. As those around him chanted about how traitors (meaning USCP and members of Congress) get the rope, Entrekin was laughing about how someone stole a bottle of alcohol.

**PROTESTER #4:**     Traitors get the rope!

**ENTREKIN:**     They had rubber bullets. Haha. He took whiskey. That guy's got a whiskey bottle.



*IMAGE 20—A screenshot from a video recovered from the defendant's phone. The screenshot shows an unidentified individual holding a bottle of amber liquid as he leaves the Capitol through the door just outside the Senate Parliamentarian's office.*

**ENTREKIN:** They raided this office. They broke the windshields right here.



*IMAGE 21—A screenshot from a video recovered from the defendant's phone. The screenshot shows an unidentified individual draped in an American flag standing by a broken window of the Capitol.*

**PROTESTER #5:**     [*using bullhorn*] Come on in! Bring it in!



*IMAGE 22—A screenshot from a video recovered from the defendant's phone. The screenshot shows an unidentified individual holding a bullhorn and encouraging other protestors to enter the Capitol.*

**ENTREKIN:**      Why can't you people just do what we want? Why do you gotta make it so hard? Why do you take our money and use it for nefarious purposes? Every man woman and child should have a house in this free nation. We should not have homeless at all. We're a rich enough nation everyone can have a house of their own. $600 my ass. Get us a fuckin' house! Buy us houses! You shut us down and you stay up? You keep our money? I know, my mom's gonna hear that. Sorry, Mom. I dropped some f-bombs. Hahaha.

While Entrekin never specifically states to whom he is directing this diatribe, it

appears to be generally towards member of Congress.

### *VIDEO # 7*
*January 6, 2021—3:03 PM*
A video recovered from Entrekin's cellphone. At the time of filming, Entrekin appears to have been making his way towards the Senate Wing Door, which had by this time been breached for a second time.

**CROWD:**         [*chanting*] Traitors get the rope!

**ENTREKIN:**      I'm deeply saddened, and yet I'm deeply humbled at the same time. I'm sad yet I'm happy. Yeah. We the People . . .

Entrekin had left the Parliamentarian Door of the Capitol at approximately 3:01 p.m. Just a few minutes later, he was happily reentering through the Senate Wing Door.



*IMAGE 23/23a—Screenshot from USCP CCV showing Entrekin reentering the Capitol through the Senate Wing Door at approximately 3:07 p.m.*

<u>**VIDEO # 8**</u>
*January 6, 2021—3:08 PM*
A video recovered from Entrekin's cellphone. At the time of filming, Entrekin was walking south towards the Crypt on the first floor of the Capitol. The whole time Entrekin was cracking jokes, telling others about his costume, and talking about why he believed Captain Moroni would be a part of the Capitol Siege.

**ENTREKIN:**     Looks like I went to the other side. I guess this is the other side here. [*chanting with crowd*] U-S-A! U-S-A!



*IMAGE 24—A screenshot from a video recovered from the defendant's phone. The screenshot shows the defendant who is recording himself while chanting U-S-A, U-S-A.*

**ENTREKIN:** [*chanting to the crowd's rhythm of U-S-A*] No more Taco Bell. I'm too fat. Hahaha.

**PROTESTER #6:** Where are the traitors? Bring them out!

**ENTREKIN:** U-S-A! Wow, wow! This is a big-ass place. Where's my ice cream, Nancy?[5] Hahaha.

Hello? Can, uh, are we coming in? What's in there? What's in there?



*IMAGE 25*—*A screenshot from a video recovered from the defendant's phone. The screenshot shows what the defendant recorded as he entered the Capitol's Crypt.*

**ENTREKIN:** [*enters Crypt*] Oh wow. [*inaudible*] This is our house! Wow, Mom. I wish you were here with me. It's really exciting in here. It's joyful and it's sad at the same time.

We can't let Biden . . . to be our president. We can't . . . there's no way.

**PROTESTER # 7:** Hail Caesar!

**ENTREKIN:** Peaceful, peaceful, peaceful. FREEDOM!

---

[5] This and subsequent references to Nancy Pelosi and ice cream may be a reference to a widely shared video in which House Speaker Nancy Pelosi tells The Late Late Show's host James Corden about her freezer that she keeps stocked with ice cream. https://twitter.com/SpeakerPelosi/status/1250080704446238725.

| | |
|---|---|
| **CROWD:** | [*chanting*] U-S-A! U-S-A! Our house! Our house! |
| **ENTREKIN:** | Our house! Our house! |
| **ENTREKIN:** | We gotta make way for the others. Make way for the others. There's more of us. We gotta take turns, we're taking turns guys. We gotta take turns. |
| | [*to another protester*] Captain Moroni. The Book of Mormon. The William Wallace of the Book of Mormon. Captain Moroni. Alma Chapter 46. But I'm here for freedom, and you're here for freedom. FREEDOM! |
| **CROWD:** | FREEDOM! |
| **ENTREKIN:** | We are not antifa. |
| **PROTESTER #8:** | I like your outfit. |
| **ENTREKIN:** | I wish I wasn't so damn fat. Hahaha. |
| **PROTESTER #8:** | Well, it's okay. |
| **ENTREKIN:** | I'm representing Captain Moroni, Captain Moroni of the Book of Mormon. A William Wallace figure of the Book of Mormon. |
| **PROTESTER #8:** | Wow! |
| **ENTREKIN:** | Captain Moroni, uh, was a Freeman, fighting for the free cause against the King-Men. |
| **PROTESTER #8:** | You're a Mormon? |
| **ENTREKIN:** | Yes, uh, LDS, Mormon. |
| **PROTESTER #8:** | I gotta go this way. [*indicating a direction opposite of the defendant*] |
| **ENTREKIN:** | Okay. |
| **PROTESTER #8:** | Nice to meet you. |
| **ENTREKIN:** | Nice to meet you. Can I go in here? [*indicating Room S140, Sen. Jeff Merkley's (D-OR) Office*] |
| | [*shouting to the protesters inside Room S140*] Where's my ice cream? |



*IMAGE 26—A screenshot from a video recovered from the defendant's phone. The screenshot shows two unidentified individuals inside Room S140 after the defendant went through the door.*

**ENTREKIN:**  [*to a protester*] I just went in there, where's my ice cream? Hahaha. I want my ice cream! Nancy, where's my ice cream?!

**CROWD:**  Stop the steal! Stop the steal!

**PROTESTER #9:**  Antifa never did this shit!

**ENTREKIN:**  Nope, nope. That's true. That's true. Nope, you're right.

All right, I guess uh with respect to the people that are coming in I gotta get out. We got more people who want to come in, we gotta respect that too, you know.

Ope, sorry you guys. Uh, well, whoa. Alright. I'm glad they're not doing rubber bullets anymore. They were on the other side. I should've bought that centurion helmet after all. Alright. Gotta go, mom. Yo!

During the non-custodial interview of Entrekin on February 2, 2021, he made several claims that are inconsistent with the videos that he recorded and narrated for his mother. For example, Entrekin claimed that he was not aware that he was not allowed in the Capitol. Entrekin further claimed that individuals were basically being herded into the building. Entrekin further

claimed that his experience inside the Capitol was "solemn" and "revered," and that when he observed broken glass and the looting of offices, he felt the need to depart the Capitol immediately.

These claims are inconsistent with the fact that the defendant identified early in the first video he recorded that he could see and smell tear gas (Video 1). Entrekin also made a point of narrating to his mother when the "riot police" arrived (Video 3).

When the defendant first entered the Capitol through the Senate Parliamentarian's Door, one can hear an alarm blaring, he saw water on the floor, he said that "they" were pushing the crowd back out, not in. Entrekin further told his mother through the recorded video that he heard what he identified as "machinegun tasers" (Video 5). Still, he pushed forward and entered the Senate Parliamentarian's office.

Inside the Parliamentarian's office, Entrekin recorded destruction and what he described as looting. He recorded the papers strewn about and broken windows, and he expressed distress. Entrekin further began shouting that police officers were using rubber bullets. Only at this time did Entrekin leave the Capitol for the first time. He would reenter a short time later.

Before reentering the Capitol, and while standing in the Northwest Plaza, Entrekin laughed about a bottle of whiskey that he thought had been stolen from the Parliamentarian's office (the defendant misidentified it as Nancy Pelosi's office); he recorded protesters chanting, "Traitors get the rope!"; and he himself harangued members of Congress, stating, "Why can't you people just do what we want? Why do you gotta make it so hard? Why do you take our money and use it for nefarious purposes?" Still, he pushed forward.

By approximately 3:08 p.m., and despite the ditress he claims to have felt when seeing the Parliamentarian's Office torn apart, Entrekin was back inside the Capitol, once again joining in chants of U-S-A! U-S-A! and "Whose house?" "Our house!" (Video 8). Entrekin reiterated to other

persons what role he saw himself as playing that day, referring to Cpt. Moroni's fight against the King-Men and to William Wallace's fight for freedom.

Entrekin pushed his way into Sen. Jeff Merkley's office and shouted that he wanted ice cream. Entrekin agreed with another protester who stated, "Antifa never did this shit!" Additionally, and importantly, Entrekin stated while inside the Capitol, "We can't let Biden . . . to be our president. We can't . . . there's no way."

In total, Entrekin spent approximately thirteen minutes inside the Capitol, but several hours on restricted grounds. Entrekin saw the destruction inside the Parliamentarian's Office, was forced out with the rest of the rioters from the Parliamentarian's Office corridor, and reentered just a few minutes later after giving a speech to no one in particular in the NW Plaza, 'Entrekin admitted at his change of plea hearing that he knew both times he entered the Capitol that he did not have permission or authority to do so. Entrekin further admitted that while inside the Capitol, he paraded, demonstrated, or picketed.

*Entrekin's FBI Interview*

On February 2, 2021, prior to his arrest, Entrekin voluntarily agreed to speak with the FBI and admitted to his conduct on January 6, 2021. Entrekin also provided his cellphone to federal agents so that they could preserve the media he recorded on January 6, 2021. To the government's knowledge, Entrekin has eschewed social media and has not attempted to publicly defend his actions or the actions of others who were part of the Capitol siege on January 6, 2021. Although Entrekin entered sensitive spaces of the Capitol and entered twice, there is no evidence that he personally engaged in violence against police officers or others on January 6, 2021.

### III.   THE CHARGES AND PLEA AGREEMENT

On July 14, 2021, Entrekin was charged via Criminal Complaint with violations of 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On July 15, 2021, he was arrested in

Cottonwood, Arizona. On November 18, 2021, Entrekin was charged by five-count Information with violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(C), (D), and (G). On January 14, 2022, Entrekin pleaded guilty to Count Five of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol building. By plea agreement, Entrekin agreed to pay $500 in restitution to the Department of the Treasury.

## IV.    STATUTORY PENALTIES

Entrekin now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Entrekin faces a term of imprisonment up to six months and a fine of up to $5,000. Entrekin must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this misdemeanor case, 18 U.S.C. § 3553(a) informs the factors the Court must consider in crafting a sentence that is sufficient, but not greater than necessary to achieve the goals under that same section. This section identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of a split sentence of sixty days incarceration followed by a three-year term of probation.

## VI.      THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The siege of the Capitol on January 6, 2021, was an unparalleled criminal offense in American history. It represented a grave threat to our democratic norms. It was the one of the only times in our history when the building was occupied by rioters who were hostile to American democratic norms and processes.

Each defendant should be sentenced based on their individual conduct. This Court should note, however, that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they would have—at a minimum—crossed through numerous barricades and stepped or climbed over numerous barriers. They would have heard the cries and throes of a mob. Depending on the timing and location of their approach, they may have also observed fighting with law enforcement officials and smelled chemical irritants in the air or felt the effects of the same in their eyes. No rioter was a mere tourist that day.

This was certainly true for Entrekin who approached from the west. As shown in Images 10 through 13, thousands of protestors had descended on the Capitol at around the time that Entrekin would have been approaching the Capitol. He would have seen the fallen and trampled barriers around the West Lawn. Entrekin would have seen and heard the chaos on the West Plaza and heard the chants and cries as the rioters broke into the Capitol through the Parliamentarian Door. *See* "West Capitol Plaza & 'Tunnel' - 2:27-3:21 p.m. – Jan 6th" (https://youtu.be/N562Ti_vI9A?t=877). The second breach of the Senate Wing Door—a violent and aggressive concerted effort by the rioters that occurred mere yards away from the Parliamentarian Door—happened at 2:48 p.m., so Entrekin would certainly have heard the shouting and seen the violence happening in the same Plaza where he was.

While looking at each defendant's individual conduct, the government recommends that the Court assess such conduct on a spectrum. This Court, in determining a fair and just sentence

should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Entrekin not only made his way through the madness of the West Lawn to the Northwest Plaza, he also maneuvered his way inside once the Parliamentarian's Door was breached. Once he was in, he went into two separate sensitive spaces, including the Parliamentarian's Office and Senator Merkley's Office, witnessed its destruction, and despite that, he attempted to move deeper into the Capitol, not out. If the Court refers back to Images 17 and 18, it will see just how bad the destruction and vandalism of that office was. One can see the Christmas cards and personal effects on the mantle of the fireplace. One can also see how all the drawers were pulled open, papers were thrown about, and property was senselessly destroyed. Those who carried out this destruction were not looking for anything or searching for information. They wanted to instead send a message through their mindless and manic maelstrom. While perhaps Entrekin did not directly steal or destroy, he was another body of the mob, another individual who, even standing by in tacit approval, lent his strength to those who did engage.

As mentioned above, the rioters were expelled from the Parliamentarian's Door, but Entrekin stayed in the NW Plaza and made his way back inside the Capitol at the Senate Wing

Door nearly shortly thereafter. On this second trip, he opined to himself and those around him, "We can't let Biden . . . to be our president. We can't . . . there's no way."

Entrekin quickly accepted responsibility but it is difficult to assess the extent of his remorse. As several other sentencing proceedings for these defendants have shown, the expression of remorse can be an unreliable watermark in January 6 cases. For example, District Court Judge Tanya S. Chutkan spoke about remorse as follows:

> And I take into account the government's statement and [defense counsel]'s statement that he accepted early responsibility. But [the defendant's] remorse—and I believe his remorse is sincere—[the defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.

*United States v. Matthew Carl Mazzocco*, 21-CR-54 (TSC), ECF No. 32, pp. 29-30. Judge Lamberth was more skeptical in a Memorandum Opinion authorizing the imposition of a split sentence as to Class B misdemeanor convictions.

> The Court often finds it difficult to ascertain the sincerity of these particular defendants' remorse. Many defendants appear sincere at sentencing, boasting of their purportedly deep shame, regret, and desire to change and be law-abiding citizens. But this Court is all too familiar with crocodile tears. Indeed, one day after being sentenced to probation, another January 6 defendant made statements in an interview that directly conflicted with the contrite statements that she made to the undersigned.

*United States v. James Leslie Little*, 21-CR-315 (RCL), ECF No. 43, pp. 3-4.

Accordingly, the nature and the circumstances of this offense render the government's proposed sentence sufficient but not greater than necessary to reflect the seriousness of the instant offense, to promote deterrence, to protect the public from future crimes that may be committed by the defendant, and to avoid unwarranted disparity.

## VII.   ENTREKIN'S HISTORY AND CHARACTERISTICS

As set forth in the PSR, Entrekin's life reflects some struggles with abiding by the rule of law. Back on October 11, 2001, Entrekin was federally indicted on felony charges of mail fraud

and fictitious identity. He was later allowed to plead to the misdemeanor level of mail fraud and sentenced to three years' probation. *See United States v. Entrekin*, 00-CR-1333 (JMR) (Dist. of Arizona). Less than seven years ago, Entrekin was involved in an incident where he was yelling at neighbors and his mother, yelling at the latter, "If you call the police, I will fucking kill you!" ECF No. 25, pp. 10-11. Entrekin also has numerous other infractions under the vehicle and traffic law of Arizona. Entrekin now works as a Notary Public in Arizona.

For reasons listed below, Entrekin's criminal history—which already has one conviction for violent behavior—and his actions and behavior on January 6, 2021, distinguish him from many of the defendants who have received probationary sentences or sentences of home detention as a condition of probation. With these considerations in mind, it appears that specific deterrence in the form a split sentence consisting of one hundred- and five-days incarceration followed by a three-year term of probation is sufficient but not greater than necessary to specifically deter Entrekin—and others generally—from engaging in similar violations of law in the future.

## VIII.   THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND PROMOTE RESPECT FOR THE LAW

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a split sentence of sixty days incarceration followed by a three-year term of probation. The government agrees with many Judges in this District who have stated that no sentence for a January 6 defendant should

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov /files/Wray%20Testimony.pdf

be probation only. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

## IX.     THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to and did in fact interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While entering restricted grounds and moving forward, Entrekin did not turn back when he saw the downed fence and barricades. He went forward. He did not turn back when making his way through the increasingly frenzied crowd on the west front or when he saw and heard the violence taking place in the location on the Lower West Terrace known as The Tunnel. Entrekin went forward. He joined rioters in the Brumidi Corridors as others ransacked the Parliamentarian's Office. He did not recoil when he saw the destruction and mayhem. He continued recording videos and attempted to move deeper into the Capitol. He joined the group of rioters that unsuccessfully confronted law enforcement in the hallway just outside the Parliamentarian's office. When forced out of that hallway, he stayed in the NW Plaza. Minutes later, he reentered. While inside, he recorded more videos, went into another office, and talked about how, "We can't let Biden . . . to be our president. We can't . . . there's no way."

As Judge Chutkan stated:

> What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.

*U.S. v. Mazzocco*, ECF No. 32, p. 24. Entrekin came to Washington, D.C., from Cottonwood, Arizona, driving all that distance by himself so that he, dressed as Captain Moroni, could protest the peaceful transition of power in our nation.

Between the West Lawn, the Parliamentarian's Door, the Senate Wing Door, and the NW Plaza, Entrekin was at multiple points of tension and violence between police officers and rioters. Even when he saw the destruction being caused by the rioters, he stuck around. And he sought out more. He was at times a passive and at others an active participant in that mob, and accordingly, specific deterrence is necessary.

Even considering the defendant's post-crime willingness to speak with the FBI and his compliance with all the requests of law enforcement, Entrekin knew that what he did was wrong, and he knew that at the time he was doing it. Given how Entrekin left the Capitol the first time distressed, recognizing the wrongfulness of his actions, only to reenter minutes later, it is of great concern to the government that without significant specific deterrence, Entrekin would be all too disposed to do something like this again, should the right opportunity arise. The government believes that its recommended sentence will achieve the Court's and our federal government's established sentencing goals.

## X.   THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assaults on law enforcement, to conspiracy to corruptly interfere with Congress.[7]

Each offender must be sentenced based on their individual circumstances, but with the backdrop

of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges

from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The

misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor

breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should

not become the default.[8] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr.

6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome

here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie*

*Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect .

. . 'I don't want to create the impression that probation is the automatic outcome here, because it's

not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge

Friedman).

The government and the sentencing courts have drawn meaningful distinctions between

offenders. Those who engaged in felonious conduct are generally more dangerous, and thus,

---

[7] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with fewer days incarceration or home detention.

Entrekin has pleaded guilty to Count Five of the Information, charging him with willfully and knowingly parading, demonstrating, or picketing in any of the Capitol Buildings, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of his participation in the breach—help to explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced to a term of incarceration Capitol breach defendants who spent time in sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or an office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office—like the Parliamentarian's Office—poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-

cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. The Parliamentarian's Office was clearly recognizable as a private office, and thus implicates similar concerns. Again, the government recognizes that upon initially viewing the destruction of the Parliamentarian's Office, when after he leaves, he goes right back in the Capitol, and he goes right back in another office.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to forty-five days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (thirty days incarceration, one year supervised release).

Like Jancart and Rau, Andrew Ericson went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. Ericson took a beer from a mini fridge. Gov. Sentencing Mem., *United States v. Andrew Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.  Like Entrekin, Ericson was aware of the crowd outside. *See id.* at 3, 7-8, 13. The government recommended sixty days' jail time, and Judge McFadden imposed a sentence of twenty days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and

others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.* Even though Entrekin's entrances into those two offices were only momentary, he still falls into this "different category" and should be punished as such.

In most of the sentencings on similarly situated January 6 defendants, specifically those who invaded sensitive spaces, had a criminal history, and reentered the Capitol multiple times, the government has sought, and generally received some period of incarceration. Regarding criminal history, two other defendants whose criminal history served as a determining factor at sentencing are Robert Bauer and Edward Hemenway, who were charged as co-defendants in *United States v. Robert Bauer and Edward Hemenway*, 21-cr-49 (TSC). In that case, the government requested thirty days of incarceration and $500 in restitution. Both Bauer and Hemenway entered guilty pleas to the same count as Entrekin (one count of 40 U.S.C. § 5104(e)(2)(G)). Judge Tanya S. Chutkan sentenced both Bauer and Hemenway to forty-five days of incarceration, sixty hours of community service, and $500 in restitution. To support its request for thirty days' incarceration of Bauer, the government pointed to the following factors: (1) although Bauer admonished other rioters not to assault law enforcement officers, he treated the chaos and disorder around him as an entertaining spectacle, even posing for a selfie-style photograph in a mob of people inside the Capitol with his middle finger raised; (2) Bauer remained inside the Capitol for a brief period of time – approximately seventeen minutes – yet made his way into the Crypt, where police officers were being attacked; (3) Bauer admitted to his actions only two days after the riot and accepted responsibility early through a plea agreement; (4) Bauer has not expressed true remorse for his actions, stating to the FBI, "I don't feel like I done nothing terribly wrong"; and (5) Bauer has a serious criminal history. The government

relied on many of the same factors regarding Hemenway, with the differences being that Hemenway did not admonish other rioters to not assault law enforcement, admitted to his actions a few days after the riot, and expressed remorse for his actions. 21-cr-49, ECF No. 33 at 2.

Bauer's criminal history involved Operating a Motor Vehicle Alcohol-Drugs in 1999, when he was 21 years old; Possession of Anhydrous Ammonia and Vandalism in 2005; Possession of Methamphetamine, Manufacturing Methamphetamine and related charges in 2005; and Unlawful Possession of Meth Precursor in 2006. *Id.* at 11-12. Hemenway's criminal history dated back to 2004 and involved a conviction for Sexual Battery and Criminal Confinement in 2006. 21-cr-49, ECF No. 32 at 11. Entrekin's criminal history involves two misdemeanor offenses, but at one involved him yelling at and threatening both his neighbors and his mother, and he was later found to have handgun ammunition in his possession that he could not explain.

Like Entrekin, neither Bauer nor Hemenway was personally involved in acts of violence or destruction, although all three did see rioters who were actively vandalizing and destroying property. Bauer admonished other rioters not to assault law enforcement, and Mish admonished a rioter whom he saw break the mirror. The sentences requested and imposed for Bauer and Hemenway show that the requested sentence for Nathan Wayne Entrekin avoids unwarranted sentencing disparities.

Another defendant who entered an office space, Charles Pham, also received a sentence of forty-five days' imprisonment. *United States v. Charles Pham*, No. 21-cr-109 (TJK). While Pham was an active-duty police officer who downplayed his conduct to the FBI, other facts of his case resemble Bonet's: he saw confrontations between rioters and police before entering; he yelled "we're taking the house back!," he was inside the building for approximately twenty

minutes. Gov. Sentencing Mem., Pham, ECF No. 36, at 2.

The government acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez*, 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. Marquez, Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards*, 21-cr-366 (JEB).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## XI.    THE COURT'S LAWFUL AUTHORITY TO IMPOSE A SPLIT SENTENCE

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

**A. A sentence imposed for a petty offense may include both incarceration and probation.**

   **i.   Relevant Background**

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[9] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be

---

[9] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."   18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."   18 U.S.C. § 3551(b).[10]   As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."   *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."   As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."   Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."   H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing

---

[10] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."   18 U.S.C. § 3551(b).

language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### ii.    Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172

F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided

sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might

be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or

probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Entrekin pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### i.   Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[11]

## ii.    Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[12]

---

[11] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[12] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improved or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in Entrekin's case given the requested sentence of one hundred and five days.

## XII.   **CONCLUSION**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Entrekin to a split sentence of one hundred- and five-days' incarceration followed by a three-year term of probation, sixty hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
D.C. BAR NO. 481052
ACTING UNITED STATES ATTORNEY

By: Sean P. Murphy
D.C. Bar No. 1187821
Assistant United States Attorney
U.S. Attorney's Office—District of Puerto Rico
Torre Chardon, Ste 1201
350 Carlos Chardon Avenue
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov