1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

2
_____

3    UNITED STATES OF AMERICA,        ) Criminal Action
                                      ) No. 1:21-cr-00686-FYP
4                     Plaintiff,      )
                                      ) **Sentencing** (via Zoom)
5    vs.                              )
                                      )
6    NATHAN WAYNE ENTREKIN,           ) Washington, D.C.
                                      ) **May 6, 2022**
7                     Defendant.      ) Time:  11:00 a.m.
     _____

8
                **Transcript of Sentencing** (via Zoom)
9                        **Held Before**
           **The Honorable Florence Y. Pan** (via Zoom)
10                **United States District Judge**

11
                    A P P E A R A N C E S

12
     For the Government:        **Sean P. Murphy**
13   (via Zoom)                 UNITED STATES ATTORNEY'S OFFICE
                                District of Puerto Rico
14                              Torre Chardon, Suite 1201
                                350 Carlos Chardon Avenue
15                              San Juan, Puerto Rico 00918

16   For the Defendant:         **Danielle C. Jahn**
     (via Zoom)                 FEDERAL PUBLIC DEFENDER FOR THE
17                              DISTRICT OF COLUMBIA
                                625 Indiana Avenue, Northwest
18                              Washington, D.C. 20004

19   Also Present:              Sherry Baker, Pretrial Services Officer

20   _____

     Stenographic Official Court Reporter:
21   (via Zoom)                 Nancy J. Meyer
                                Registered Diplomate Reporter
22                              Certified Realtime Reporter
                                333 Constitution Avenue, Northwest
23                              Washington, D.C. 20001
                                202-354-3118

24

25

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the

3     limitations of technology associated with the use of
technology, including but not limited to telephone and video

4     signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court

5     reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7          THE COURTROOM DEPUTY:  This is Criminal Action

8     21-686, United States of America v. Nathan Wayne Entrekin.

9          Counsel, please identify yourselves for the record,

10    beginning with the government.

11         MR. MURPHY:  Good morning, Your Honor.  Sean Murphy

12    on behalf of the United States.

13         THE COURT:  Good morning, Mr. Murphy.

14         MS. JAHN:  Good morning, Your Honor.  Dani Jahn on

15    behalf of Mr. Entrekin, who is present.

16         And just for the record, in light of the CARES Act and

17    the pandemic, the defense agrees to appear in this manner.

18         THE COURT:  Good morning.  Thank you, Ms. Jahn.

19         Good morning, Mr. Entrekin.

20         THE DEFENDANT:  Good morning, Your Honor.

21         THE COURT:  All right.  And your lawyer just told me,

22    Mr. Entrekin, that you're agreeing to appear by video for this

23    hearing, and I just want to confirm that.  Is that okay with

24    you?

25         THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  All right.  Thank you.

2        So this case is here for a sentencing after

3    Mr. Entrekin's guilty plea to Count 5 of the information, which

4    charged you with parading, demonstrating, or picketing in a

5    Capitol Building.

6        Under the plea agreement, the government agreed to

7    dismiss Counts 1 through 4 of the information at sentencing.

8    Does the government now move to do that upon imposition of the

9    sentence today?

10        MR. MURPHY:  Yes, Your Honor, the government so

11    moves.

12        THE COURT:  All right.  Thank you.

13        And so upon imposition of sentence, Counts 1 through 4

14    will be dismissed.

15        I want to thank the parties and the probation officer

16    for their helpful submissions here in aid of sentencing.  I

17    have reviewed the following:  the presentence investigation

18    report; the sentencing recommendation of the probation officer;

19    the defendant's memorandum in aid of sentencing and attached

20    exhibits, which included letters from Mr. Entrekin, his mother,

21    Laura Entrekin, and his friend, Wayne Schultz.

22        I reviewed the government's memorandum in aid of

23    sentencing and its notice of filing of video exhibits, as well

24    as the six video submissions that were made.  I've also

25    reviewed the defendant's reply which attached an amicus brief

1    filed by the public defender in the case of Jeremiah Caplinger

2    on the issue of whether split sentences are permissible for the

3    offense of conviction in this case.  It appears that

4    Judge Friedman has yet to rule in that case.

5            But I've also reviewed a memorandum opinion by

6    Judge Lamberth in *United States v. Little*, holding that split

7    sentences are permissible when imposing a sentence for a petty

8    offense; and a memorandum opinion by Judge Kollar-Kotelly in

9    *United States v. Spencer*, which held that split sentences are

10   not permissible when imposing a sentence for a petty offense.

11           So that's everything that I've reviewed.  I just want to

12   make sure I haven't missed anything.

13           Anything from you, Ms. Jahn?

14               MS. JAHN:  No, Your Honor, nothing further.

15               THE COURT:  Mr. Murphy, anything from you?

16               MR. MURPHY:  No submissions.  However, when I was

17   preparing for this hearing this morning, I did notice that

18   Judge Kollar-Kotelly, on April 29th in the case of the *United*

19   *States v. Oliver Sarko* -- that's docket -- or Case No.

20   21-cr-591 -- issued a memorandum opinion and order, the holding

21   of which -- as can be seen on page 5 of that document, says

22   "Accordingly, consistent with the analysis set forth herein and

23   the recent case law from this District Court, it is

24   accordingly," and then she imposed a split sentence, 30 days'

25   incarceration followed by 3 years of probation.  So I only

1    bring that up to the Court so that insofar as it's relying on

2    judge's -- Judge Kollar-Kotelly's previous memorandum that held

3    that split sentences are not permissible, she has now issued a

4    much more recent opinion holding that they are.

5              THE COURT:  Thank you.  I'm just going to go pull

6    that up right now, because that's something I was not aware of.

7              MS. JAHN:  Your Honor, if I could also just add

8    another piece of information that is not part of the record.

9    But there is a pending matter before Judge Sullivan on this

10   issue of the legality of split sentences, and the federal

11   defender's office has filed a reply.  That criminal number is

12   21-055.  The defendant's name is Dominick Madden, M-a-d-d-e-n.

13   And there is a recitation throughout speaking about

14   Judge Lamberth's decision in *Little* and, respectfully,

15   submitting information as to why that is incorrect.  As you

16   know, what was already contained in the reply that I filed,

17   that Judge Lamberth's opinion in Mr. Little's case is now being

18   appealed.

19             THE COURT:  Okay.  Thank you.  I understand that.

20        So I'm just taking a quick look at Judge Kotelly's

21   opinion.  And I will note that I think this is a pretty

22   contained issue.  It involved statutory interpretation of,

23   really, one statutory provision read in conjunction with

24   another.  And for the record, that's 18 U.S.C. § 3561(a)(3),

25   read in conjunction with section -- 18 U.S.C. § -- I'm sorry,

1    18 U.S.C. § 3551.  And so I think this is a fairly narrow

2    issue.  I think this has been very thoroughly discussed and

3    briefed, both in the *Caplinger* brief that I read in preparation

4    for this hearing and as well as in the prior opinions.

5         And so I'm interested in, sort of, the new outcome in

6    Judge Kotelly's new opinion in *Sarko*.

7         But in terms of the legal issues, I don't think that we

8    need to take additional time to review any of this briefing or

9    any of the new arguments made because I feel like the briefing

10   and analysis has been very thorough already.  It's something

11   that people have taken a really hard look at.  I've taken a

12   really hard look at it.  And so, just for the record, I don't

13   think that we need to put off this hearing or take time out to

14   read any more opinions on this issue.

15        And I'm prepared to go forward today, understanding that

16   this is a live issue that's going to continue to be considered,

17   addressed, and discussed, and resolved by various judges on

18   this court.  So I thank the parties for the updates where

19   things stand on this issue.

20        I'm just taking a quick look at Judge Kotelly's opinion

21   because one of the opinions I did read in preparation for this

22   hearing was her prior opinion in *Spencer*.  Yeah, it seems that

23   Judge Kotelly is relying on *Little* now and has imposed a split

24   sentence.  She also applied -- relied on a Fourth Circuit case,

25   *United States v. Posley*.

1          All right.  Thank you.

2          Okay.  So for this sentencing, I think that we should

3   address that legal issue first.  I'm just going to review where

4   we stand right now.  And then I think we should talk about that

5   legal issue before we proceed to allocution.

6          For sentencing on this single count of parading,

7   demonstrating, or picketing in a Capitol Building, the maximum

8   sentence is six months' incarceration, a $5,000 fine, five

9   years' probation.  The parties dispute whether the Court may

10  lawfully impose a split sentence; that is, a sentence of

11  incarceration followed by a term of probation.

12          The probation officer recommends a sentence of 45 days'

13  incarceration, but I've consulted with Ms. Baker, and that

14  recommendation was made assuming that a split sentence is not

15  permissible.  The government recommends a split sentence of

16  105 days' incarceration followed by 3 years of probation with

17  60 hours of community service and $50 in restitution.  The

18  defendant recommends a sentence of probation.

19          And so I think before we proceed to hearing allocution,

20  we need to resolve this issue of the legality of the split

21  sentence so the parties know what the Court considers an

22  appropriate menu of options before they allocute.  And I've

23  reviewed the parties' arguments in their sentencing memoranda

24  and the authorities cited.  And I've now taken a look at the

25  *Sarko* case that Mr. Murphy brought to my attention this

1    morning.

2         And so I think this issue is just how best to interpret

3    the language in 18 U.S.C. § 3561(a)(3).  And for the record,

4    that provides, in relevant part, "In general.  A defendant who

5    has been found guilty of an offense may be sentenced to a term

6    of probation unless."  Subsection (3) says, "The defendant is

7    sentenced at the same time to a term of imprisonment for the

8    same or a different offense that is not a petty offense."

9         So I tend to agree, having read through the opinions and

10   the analysis here, with Judge Lamberth; that the best reading

11   of this language is a split sentence is permissible because I

12   read the phrase "that is not a petty offense" to modify the

13   whole phrase "the same or a different offense."  Meaning, that

14   if a defendant is sentenced to a term of imprisonment for the

15   same offense that is not a petty offense, probation would be

16   permissible.

17        So I would like to give Ms. Jahn an opportunity to

18   persuade me otherwise and ask her a few questions about her

19   interpretation.  But just from my reading, that seems to be the

20   most logical and grammatical way of reading this statute.  So,

21   Ms. Jahn, are you prepared to sort of talk through the

22   arguments that were made in *Caplinger*, which are the ones that

23   you adopted?

24        MS. JAHN:  Yes, Your Honor.  So we rely -- just for

25   the record, we rely on the amicus that was filed by A.J. Kramer

1    in that matter.  I understand that was filed before the

2    decision in *Little*.  I referenced another pleading and another

3    case a few moments ago.  I just want to do so for the record.

4    *United States v. Dominick Madden*, 21-055, where, again, the

5    federal defender's office discusses the applicability of

6    whether a split sentence is lawful and makes an argument,

7    respectfully, that Judge Lamberth's decision is not correct;

8    and -- and I'm happy to cite to you the -- the actual ECF

9    filing itself.  It's --

10           THE COURT:  Ms. Jahn, I think it's a little late for

11   that because we're at sentencing.

12           MS. JAHN:  I understand.

13           THE COURT:  Right.  So I will not consider that.  But

14   if you want to make any arguments about that, related to that,

15   I will allow you to do so.

16           MS. JAHN:  Your Honor, I will just stand by saying,

17   respectfully, we believe the *Little* decision is incorrectly

18   decided.  Judge Lamberth is the only judge -- with the

19   exception of what I've now just learned this morning,

20   Judge Kollar-Kotelly, in this other *Sarko* matter -- that has

21   ruled in the way the government has been seeking; separate from

22   you, Your Honor.  I don't know what you have done in a -- in a

23   prior case.  I don't know if you've ruled on it.

24           THE COURT:  I have not.

25           MS. JAHN:  I tried to find that answer this morning.

1    No other judge, other than Judge Lamberth, has been giving

2    split sentences.  And, in fact, this has been vetted out and

3    discussed with all of your colleagues.  And so, respectfully,

4    we believe Judge Lamberth's decision is an outlier.  There is

5    no notice and --

6          THE COURT:  But -- I'm sorry, Ms. Jahn.  Has anybody

7    else ruled that -- ruled on this issue to the contrary?

8    Because it's different to say nobody else has done it versus

9    anybody has confronted the issue and ruled in conflict with

10   what Judge Lamberth ruled.

11         Because the only holding I was aware of that ruled in

12   conflict with the *Little* analysis was Judge Kotelly's written

13   opinion in *Spencer.*  And that, apparently, has been repudiated

14   in *Sarko.*  So are you aware of any other actual ruling on this

15   issue?  Are you just saying nobody yet has adopted that

16   reasoning?

17         MS. JAHN:  So I'm not aware of a written opinion to

18   reflect what we're discussing.  However, I personally have been

19   a part of many sentencing hearings, as have my colleagues from

20   the federal defender's office, where this issue has been fully

21   vetted and discussed, and the outcome and ultimate sentences

22   imposed at least appear to be consistent with saying they are

23   not -- they do not read the statute that way.

24         I know I had a matter before Judge Nichols.  The matter

25   involved Dalton Crase.  He did not issue an opinion ruling.  He

1    just disagreed.  And my categorization of it is that perhaps

2    the Court thought a safer course was to impose a different way

3    of a sanction rather than dealing with this legal issue.  In

4    all candor, I think my assessment of perhaps -- some other of

5    your colleagues have ruled in the same way.  They haven't said

6    it that way, but they have made a choice about either

7    imprisonment or probation with other conditions.

8           And so I agree there has not been another opinion, but

9    there has been a lot of discussion on the record at all of

10   these sentencing hearings about these issues, Your Honor.

11          THE COURT:  Yes.  Thank you.

12          So my understanding, just anecdotally, from talking with

13   some of my colleagues and based on my own experience, is that

14   judges don't want to reach this issue unless they have to.  And

15   so, for example, in a sentencing that I recently did, this

16   issue was raised and teed up, but I made the determination to

17   give a sentence in a halfway house, which was a condition of

18   probation, and I did not need to resolve this legal issue given

19   the sentence that I determined was the appropriate one.

20          And in talking to some of my colleagues, it -- many of

21   them have told them they just haven't reached the issue.  And I

22   think people -- which I think is the right way to approach

23   this.  If you don't need to resolve it, you don't.  And it

24   seems that there have been many cases in which judges have

25   found there were appropriate sentences that they could impose

1    without needing to actually reach this issue.

2         And so you're telling me, however, that you believe that

3    Judge Nichols verbally reached this issue and ruled the other

4    way?

5         MS. JAHN:  Yes, Your Honor.  In that matter, it was a

6    much shorter time period.  It was a 14-day request by the

7    government.  And, again, the same arguments were -- were

8    presented in this particular case.  I don't have the transcript

9    so I want to be very careful, but we did then reappear.  You

10   should know there was questions about intermittent confinement,

11   weekends, and the like.

12        Ultimately, what I can tell you is that the sentence was

13   modified because there was not a facility available to one of

14   the co-defendants, and Judge Nichols wanted each of the

15   defendants in that case to be treated the same.  So he modified

16   the condition of probation to home confinement, which was the

17   request of the defense from the beginning.  And so that went --

18   that case is a little bit, obviously, different than this one,

19   but --

20        THE COURT:  Yes.

21        MS. JAHN:  And there is a longer history there, and

22   some issues that were unforeseen.  So it is not virtually the

23   same.

24        THE COURT:  Okay.  Thank you.  I appreciate that.

25   And I do think that that's a feature of all of these sentences

1      that -- involving January 6th misdemeanants, that none of them

2      are exactly the same.  Everything is so fact-dependent.

3            So if we could just talk for a moment about the legal

4      issue, Ms. Jahn.  I think what this boils down to is reading --

5      I'm just going to pull this up -- the statutory language that I

6      just indicated.  And so the operative language is "Unless the

7      defendant is sentenced at the same time to a term of

8      imprisonment for the same or a different offense that is not a

9      petty offense."  And my understanding of the argument against

10     the *Little* analysis is that the phrase "that is not a petty

11     offense" modifies only a different offense.  It does not modify

12     the same offense.

13            Do you have the language in front of you, Ms. Jahn?

14     Because I just want to talk to you about this for a moment.

15            MS. JAHN:  I was trying to pull it up quickly, Your

16     Honor.  So are you referencing the *Little* case?  Are you

17     referencing -- just so I can get the right language you're

18     referring to.

19            THE COURT:  Sure.  I'm just referencing the statutory

20     language.

21            MS. JAHN:  Understood.

22            THE COURT:  And so that is in the *Caplinger* brief

23     that you attached --

24            MS. JAHN:  Yes.  Yes.  I have that right here.

25            THE COURT:  -- in your reply.

1          So if you look under -- it's on page 3, No. 3, where you

2    talk about probationary sentences.  The relevant statute at

3    issue is section 3561(a)(3).  Do you see that?

4          MS. JAHN:  I do, Your Honor, yes.

5          THE COURT:  Okay.  So my question is:  Under the

6    interpretation that you are advocating, what does -- what do

7    the words "the same" modify?  Because it says, "The defendant

8    is sentenced at the same time to a term of imprisonment for the

9    same or a different offense that is not a petty offense."  The

10   same what?  What does "the same" modify?

11         MS. JAHN:  So you're referring to the -- to the

12   second phrase of "the same"; correct?

13         THE COURT:  Yes.

14         MS. JAHN:  And so that would modify not a petty

15   offense.

16         THE COURT:  But that's not grammatically correct.

17   He's sentenced at the same time to a term of imprisonment for

18   the same, not a petty offense.

19         MS. JAHN:  For the same -- I understand how you've

20   read it.  And I want to be consistent with *Caplinger*,

21   Your Honor.

22         THE COURT:  *Caplinger* says that -- doesn't address

23   what "the same" modifies.  They just say that "that is not a

24   petty offense" only modifies a different offense.

25         And then my question is:  Well, what about "the same"?

1  What does "the same" modify?  Because it seems to me that the

2  same must modify "offense," which means the same offense that

3  is not a petty offense.  Because "that is not a petty offense"

4  certainly modifies "offense" in that second phrase.  And if

5  "the same" is modifying offense, then you can only read it as

6  the same offense that is not a petty offense.

7          MS. JAHN:  Your Honor, I'm trying to read it multiple

8  ways.  The way that you --

9          THE COURT:  Sure.  Take your time.  I sprung this on

10  you, and I want to get this right.

11      So the phrase is "The defendant is sentenced at the same

12  time to a term of imprisonment for the same or a different

13  offense that is not a petty offense."

14          MS. JAHN:  For the same --

15          THE COURT:  Yes.  "[T]he same or a different offense

16  that is not a petty offense."  *Little* reads, "that is not a

17  petty offense" to modify the whole phrase "for the same or a

18  different offense."  *Caplinger* amicus brief reads "that is not

19  a petty offense" to modify only a different offense.

20          MS. JAHN:  Yeah.

21          THE COURT:  And I -- and under the *Caplinger*

22  analysis, I'm wondering what does "the same" modify?

23          MS. JAHN:  Could I have a moment to -- because this

24  is such a big issue?

25          THE COURT:  Of course.

1          MS. JAHN:  And Mr. Kramer wrote the *Caplinger*.  I

2     don't want to make a statement that would be inconsistent with

3     that.  And so could I have a moment to try to confer?

4          THE COURT:  Yes, you may.  You can mute us, if you'd

5     like to.

6          THE DEFENDANT:  Ms. Jahn, should I -- should I be in

7     with you there?

8          MS. JAHN:  No.  Just hold on a second.

9          THE DEFENDANT:  Okay.

10          (Off the record.)

11          MS. JAHN:  Your Honor, I'm unable to reach -- as you

12     saw me, I was on my phone trying to reach a whole host of

13     folks, and no one is picking up this very moment.  And so if

14     you would just allow, perhaps, maybe just tabling this issue

15     for a moment, and I can email and try to see if I can get more

16     clarity, since I was unable to reach someone.  Would you allow

17     for that?

18          THE COURT:  Yes.

19          MS. JAHN:  I just didn't expect that you would be

20     focusing on this language here, and I just don't want to be

21     inconsistent for the record.

22          THE COURT:  No, I understand.  That's fine, Ms. Jahn.

23          MS. JAHN:  Okay.

24          THE COURT:  I had another question that you might

25     want to add to your email.  Maybe we should discuss that before

1   you send it.

2           MS. JAHN:  Okay.  All right.

3           THE COURT:  And so I'm interested in whether your

4   interpretation in *Caplinger* makes sense.  And so the government

5   is saying that what this language does -- and, admittedly, this

6   language is not the model of clarity that we would hope for --

7   is it says that you can have split sentences for petty

8   offenses, whether it's the -- for the same offense or for a

9   different offense, but you can have split sentences for petty

10  offenses.

11          That's kind of the bottom line of their position.  And

12  they say that that makes sense because you can't get supervised

13  release for petty offenses.  So for all the other types of --

14  of crimes where you can't have probation, you can have

15  supervised release.  So that's the reason why this

16  interpretation makes sense.

17          The interpretation that is advocated in *Caplinger* -- or

18  the amicus brief in *Caplinger* is that that is not a petty

19  offense; that last phrase only modifies a different offense,

20  which means that if it's the same offense, you can't have a

21  split sentence.  In fact, split sentences are never allowed.

22  But there is a situation where it appears -- this amicus brief

23  is advocating -- there are two petty offenses, then one of them

24  can have a probationary sentence.  That's kind of what the

25  bottom line is.  Because you're saying "that is not a petty

1    offense" only modifies a different offense.  So if it's the

2    same offense, probation is not allowed, but it would be if it's

3    a different offense that is not a petty offense.

4         So I want to, kind of, provide a concrete example of how

5    that would work under your view of *Caplinger*, which is:  Say

6    there were two petty offenses, two counts of parading, that

7    means then I can have a probationary sentence for one of them

8    just because there are two counts that are misdemeanor

9    offenses?  It just doesn't make sense to me.  So I want to

10   understand why the interpretation that is advocated in

11   *Caplinger* makes any sense just on a big-picture level.

12        Why would we want a situation where any time there are

13   two petty offenses, you can impose probation for one of them?

14   It just doesn't make sense.  That seems to be the implication

15   of the interpretation that is advocated in *Caplinger*.

16             MS. JAHN:  I think that's the argument, Your Honor;

17   is that if there are two, a Court could impose probation for

18   one and then a term of incarceration for the other.  That

19   doesn't seem inconsistent because --

20             THE COURT:  But why would we want that?

21             MS. JAHN:  Well, I don't think we would want that,

22   respectfully, but I think that is consistent with the statutory

23   language as written.  So that --

24             THE COURT:  So I -- maybe I phrased that wrong.  I --

25   not why would we want that but why does it make sense?  Why

1    would Congress have written it so that we could do that, is

2    kind of my question?

3           Whereas, the government's interpretation makes sense.

4    It's saying, if it's a petty offense, you can also have

5    probation because you can't supervise them with supervised

6    release.  So any petty offense, you can have a split sentence,

7    whether it's in the same offense or a different offense.  But

8    if it's petty, you can have a split sentence.  That's kind of

9    their bottom-line.

10           Whereas, the *Caplinger* interpretation is if you have one

11   petty offense, you're out of luck.  There can be no supervision

12   for this person.  It's either incarceration or probation, but

13   you can't have a split sentence.  Like, with -- even though for

14   all felony offenses you could have incarceration with

15   supervised release.  But for misdemeanors, we just have this

16   sort of different situation, unless you have two petty

17   offenses.  Then you could have all probation for one; and, I

18   guess, for the other, maybe all probation for both; right?

19           You could have all probation for both but no split

20   sentence, or you could do something weird, like have

21   incarceration for one, run them consecutive, and have probation

22   for the other.  But why should a court have to do that if it

23   wants to impose a split sentence?  And how come you can only do

24   it if there are two charges?  Doesn't that invite the

25   government to try to charge two counts that are pettys so they

1    can -- it just doesn't -- the whole thing doesn't make sense.

2          MS. JAHN:  Well, there's -- as you've just

3    articulated, there's so many different combinations that could

4    be had.  But if the Court wanted to impose probation under the

5    probation statutory authority, there is an opportunity for a

6    court to give intermittent confinement, one, or other

7    conditions.  You mentioned earlier that you impose halfway

8    house placement as a condition.  So there are other mechanisms

9    within the other statutory authority, not 3561, that allow for

10   these different opportunity sentences that you've just

11   articulated, if that makes sense.

12         THE COURT:  But then the question is why would

13   Congress want to preclude a sentence that's not intermittent?

14   Like, there's a way of getting to confinement if it's

15   intermittent with probation, but your reading of *Caplinger*

16   seems to indicate that there are some reasons -- some good

17   reason why we would want to preclude a sentencing court from

18   imposing a split sentence of, say, 30 days and then 3 years of

19   probation.

20         MS. JAHN:  Because there's no notice to a -- the way

21   that we are reading and interpreting these statutory

22   authority and go back to the plea agreement even of itself,

23   there is no notice that someone could be imprisoned up to

24   six months and an additional term of probation, and the

25   probationary terms can -- can be different.  But --

1          THE COURT:  Can I ask you about that, Ms. Jahn,

2     because I did see that in your reply brief.

3          In a normal felony case, it'll say whatever -- the

4     maximum is 15 years' imprisonment, a $10,000 fine, but you

5     can -- you can do both.  Like, you don't have to say in your

6     plea agreement that both of these are applicable.  Like, why is

7     this different?

8          MS. JAHN:  So, Your Honor, in -- in this plea, it

9     spells out what all the maximum penalties are.  It specifically

10    states there's a fine.  It says a term of probation not more

11    than five years.  It also started with a six-month maximum of

12    imprisonment.  And so it's -- the way the statutory reliance on

13    probationary offenses is, it's giving notice to defendants.  It

14    is either/or.  So you are either going to prison for up to

15    six months, or you are getting probation up to five years.  And

16    then there are conditions of probation that can, frankly,

17    include intermittent confinement.  So it's not like it's

18    precluding it outright, but it's either one.

19          THE COURT:  I'm looking at the plea agreement now.

20    It seems to say "and."

21          MS. JAHN:  Well, it says all of these, yes, and so it

22    says --

23          THE COURT:  But doesn't say "or."  It says "and."

24    "Your client understands that a violation" --

25          MS. JAHN:  Well, it --

1    THE COURT:  -- "carries a maximum sentence of

2    six months of imprisonment . . . a fine of not more than

3    $5,000 . . . a term of probation of not more than 5 years; and

4    an obligation to pay any applicable interest or penalties."

5    MS. JAHN:  Your Honor, there's semicolons between

6    each one of those.  And so whether or not it's used as a comma

7    or a semicolon, frankly, I just think it's including every

8    scenario of what could happen, but it does not say combined in

9    that way.

10    THE COURT:  It implies combined because it says

11    "and."

12    MS. JAHN:  Respectfully, I don't think it applies

13    that way because you have to go back to, then, what does

14    probation entail and what is the statutory authority for

15    probation.  And that's where *Caplinger* comes into play and how

16    it's spelled out.

17    THE COURT:  So I think that's a different argument,

18    Ms. Jahn.  Like, I appreciate you bringing us back to the plea

19    agreement.  I think that's important, but this plea agreement

20    does not, from my reading of it, indicate that it's an "and" --

21    it's an "or" proposition; that it's either imprisonment or

22    probation.  It's not spelled out here in any way.

23    And the only indicator is "and," not "or," and I -- and

24    I'm kind of back to my first sentence, which is almost all

25    federal criminal statutes have alternative maximums, such as

1    15 years of incarceration and a $5,000 fine or -- and it's

2    never interpreted as "or."  It's always you could give both;

3    right?  And I'm just wondering why this should be any

4    different.

5            MS. JAHN:  Right.  But that affects liberty and then

6    finances.  So I see them as completely different.  Versus we're

7    talking about liberty outright.  So you're talking about

8    incarceration and then --

9            THE COURT:  No, I understand that.  I'm just saying

10   why -- the normal way of looking at criminal statutes is that

11   you can give any combination of this list of things that are

12   listed, and you're saying that that's not true in this

13   instance.  And I understand the arguments that are -- that are

14   made in *Caplinger*, et cetera, as to why.  But it just seems not

15   the norm in terms of this plea agreement and just the general

16   way we look at criminal maximums, that this is an "or"

17   situation.  It's usually -- the default is an "and" situation.

18           MS. JAHN:  I -- I hear you in terms of the felony

19   matters, and so I'm not trying to dispute you on that.  I think

20   this is --

21           I'm sorry, Your Honor.  I didn't hear you.

22           THE COURT:  You're just saying there's a reason as to

23   treat this differently?

24           MS. JAHN:  Correct, Your Honor.  This is -- as you

25   well know, but for the events of January 6th, we have not seen

1    the volume of misdemeanor type of offense conduct that now we

2    are seeing.  And this issue, frankly, has only come up in this

3    context because then it was realized that there -- one, there's

4    this issue, and if courts wanted to impose some sanction

5    involving incarceration, how could they do that?  And you're

6    right.  And some of your colleagues have said, well, I don't

7    want to reach that legal decision.  I'm just going to impose

8    incarceration outright for whatever reason.

9        I think for those that wanted some incarceration and

10   supervision, they have then now reached the -- the issue and

11   have found an alternative means that is appropriate given the

12   3553(a) factors for that particular individual that could

13   warrant house arrest or a weekend in jail or some sort of other

14   intermittent confinement.  And so I just -- I just want to

15   ensure -- I'm just relying on what has been put forward in

16   *Caplinger* and want to maintain consistency there, Your Honor.

17       THE COURT:  Okay.  That's fine with me.  And so those

18   are my two outstanding questions, if you want to confer with

19   Mr. Kramer.

20       MS. JAHN:  Can you restate the exact second question?

21   It seemed we had a lot of exchange there, and I just want to

22   make sure I'm understanding.

23       THE COURT:  Oh, sure.  The question is:  If we were

24   to adopt the analysis and reasoning of the amicus brief in

25   *Caplinger*, it seems that -- it seems that the way this would

1    work in practice is that if there were two petty offenses, then

2    you could impose a probationary sentence; but if there's only

3    one, you never can.  And why does that make sense?

4         Because my bottom-line is why is it that if there were

5    two offenses of conviction of parading, then I could try to

6    fashion a split sentence by saying incarceration on one,

7    probation on the other, consecutive.  But, otherwise, there are

8    no split sentences.  And what would be the policy rationale to

9    support such a regime?

10        MS. JAHN:  Thank you.  I will try to find an answer.

11        THE COURT:  Okay.  Do you want me to give you a

12   minute to --

13        MS. JAHN:  That would be helpful.  Thank you.

14        THE COURT:  Take a moment, Ms. Jahn.

15   Ms. Jahn, it occurs to me -- do you think we need to

16   just take a break?  Because I really can't move on to the

17   sentencing until we resolve this legal issue, and I don't know

18   that we can resolve it until you've had a chance to make the

19   record and talk to your people.

20        MS. JAHN:  If you would allow just a few moments of

21   indulgence and I can step away from the connection and try to

22   get the answers to your questions, that would be helpful,

23   Your Honor.

24        THE COURT:  Okay.  Should we take 15 minutes?

25        MS. JAHN:  That would be great.  Thank you.

1          THE COURT:  All right.  Let's take 15 minutes.  Thank

2     you.

3          MS. JAHN:  Thank you.

4          (Recess taken.)

5          MS. JAHN:  Your Honor, I tried during the break --

6     thank you -- to get answers to the two questions.  This is a

7     very involved issue that is going to affect many other persons.

8     So just for the record, I -- if the Court would be so inclined

9     to allow a brief continuance so I can brief it more fulsome in

10    response to your questions.  Because I recognize there is a

11    grammatical issue that we've talked about and excised certain

12    language out; but, frankly, it -- if we did that, it would

13    ignore the context of the entire Sentencing Reform Act and the

14    statutory authority.

15          I think the argument is that if we read it in the way

16    that you're suggesting -- or, frankly, that I might be

17    suggesting -- there is a grammatical issue, which I recognize.

18          THE COURT:  I just don't want more briefing on this.

19    I think this is fully briefed.

20          MS. JAHN:  All right.  Well --

21          THE COURT:  I mean, I just want to have oral

22    argument.

23          MS. JAHN:  I hear you, Your Honor.

24          THE COURT:  And, frankly, Ms. Jahn, I feel like you

25    should have been prepared to --

1          MS. JAHN:  I understand.  It's just a nuance here

2     with where the language is.  So I just think for the record,

3     Your Honor, that you can't look at this divorced from the

4     context of the Sentencing Reform Act.

5          And -- and your second question was about the policy

6     rationale for when there are two cases involving petty

7     offenses.  And you gave the example of you could impose jail in

8     one of those petty offenses and then probation in another.  And

9     I think that's absolutely correct because it's two offenses

10    that someone has either been found guilty or admitted guilt to.

11    And, of course, you could give them a much harsher sentence for

12    two offenses.  So I think the policy rationale there is

13    supported by their two separate offenses in and of themselves

14    and someone --

15          THE COURT:  Could I give -- let me just ask you this:

16    Could I give probation for a felony offense if there's a

17    different offense that's not a pretty offense in addition,

18    because it seems like your interpretation would allow that,

19    within -- within that -- within the language of subsection (3),

20    putting aside the other subsections.  It just seems like --

21          MS. JAHN:  But a felony didn't preclude -- I know

22    there are classes of felonies that preclude probation.  So if

23    it was not precluded, you could then give -- you're asking

24    could you give probation for a felony offense or -- in

25    addition to another felony term of imprisonment; is that your

1    question?

2         THE COURT:  So, yeah, my question is:  If we're just

3    looking at the language of subsection (3), it seems to plainly

4    apply to petty offenses because there's explicit carve-out for

5    felony offenses in subsection (a); right?

6         MS. JAHN:  So, Your Honor, I think the argument --

7    just to make sure I'm saying it correctly, if we go back under

8    (a) and if you're reading, "A defendant who has been found

9    guilty of an offense," that is the same --

10        THE COURT:  No, but (a)(1) says, "The offense is a

11   Class A or Class B felony."

12        MS. JAHN:  Oh, I'm sorry.  We're back to the felony.

13        THE COURT:  (a)(1).  Right.  So (a)(3), clearly, is

14   dealing with petty offenses because felony offenses have been

15   carved out.

16        So the defendant's sentenced at the same time to a term

17   of imprisonment for the same or -- the same or a different

18   offense.  Because my point is "same" must be modifying

19   "offense."  Same or different offense that is not a petty

20   offense.  So --

21        MS. JAHN:  So, Your Honor -- but before --

22        THE COURT:  Anyway --

23        MS. JAHN:  I -- I'm so sorry.  But I think the

24   argument, though, is the phrase "the same" from subsection (3)

25   modifies the word "offense" in subsection (a).

1          THE COURT:  And not the "offense" that's three words

2     away from the same?

3          MS. JAHN:  Yes.  So I understand how you're -- how

4     you're reading it, consistent with Judge Lamberth.  I think

5     *Caplinger*'s argument is that "the same" from section (3)

6     modifies under the provision of (a) "of an offense" that begins

7     this analysis.

8          THE COURT:  Okay.  So you're saying it is the same

9     offense, but the offense that's the same is modifying -- is

10    from the language under subsection (a) where it says, "A

11    defendant who has been found guilty of an offense."  That

12    offense?

13         MS. JAHN:  Yes.

14         THE COURT:  Which is three lines above where the word

15    "the same" appears.  And if you're saying it modifies that

16    instead of the word "offense" that is three words away under

17    subsection (3)?

18         MS. JAHN:  Yes.

19         THE COURT:  Okay.  All right.  I don't find that very

20    persuasive, but I understand the argument now.  Thank you.

21         Okay.  And then do you have an answer to my second

22    question, which was why this -- why would the bottom-line, sort

23    of big-picture, outcome make sense under your proposed

24    interpretation?

25         MS. JAHN:  Your Honor, in terms of what is the policy

1    rationale for why it should be done in the context of two

2    separate offenses?

3              THE COURT:  You would have to have two offenses to

4    have probation -- two petty offenses in order to have

5    probation.  Why is that -- why does that make sense?  Why would

6    Congress write it that way and want it that way?

7              MS. JAHN:  Because they didn't expressly state

8    otherwise.

9              THE COURT:  Well, if you interpret it the way the

10   government is advocating and the way *Little* did, they did.

11             MS. JAHN:  We just, respectfully, disagree with the

12   *Little* analysis.

13             THE COURT:  Okay.  All right.  Thank you.

14         And I just want to just note, for the record, I don't

15   think it's appropriate to continue this sentencing for

16   additional briefing.  And I started this hearing saying I think

17   this issue is a pretty contained one, and I think it's been

18   fully briefed and analyzed and discussed.  And so I am not

19   inclined to continue this for more briefing.

20         And I did want to give Ms. Jahn an opportunity to

21   consult with people in her office in order to make sure that

22   she's adhering to their position with respect to this

23   interpretation, but I don't want to put off the sentencing;

24   because I feel like that is preparation that should have been

25   done in advance of the hearing given that these issues were

1    squarely raised, and it was entirely foreseeable that I would

2    need to reach this issue if I were to consider the government's

3    sentencing recommendation in this case.  So I'm not inclined to

4    put this off anymore for those reasons.

5         Is there anything you want to add for the record,

6    Ms. Jahn?

7         MS. JAHN:  No, Your Honor.  Just in sum, we believe

8    *Little* was wrongly decided.  We believe that the Court cannot

9    divorce this particular language from the context of the

10   Sentencing Reform Act and rely on the previously submitted

11   materials in *Caplinger*.

12        THE COURT:  Okay.  Thank you, Ms. Jahn.

13        Mr. Murphy, did you want to be heard on any of these

14   issues?

15        MR. MURPHY:  Yes, Your Honor.  And I'll keep it --

16   famous last words, but I'll try to keep it brief.

17        I just wanted to round out a bit the analysis of what

18   judges have -- have fallen where.  And, again, my -- my only

19   ability to do so is anecdotal.  I do know that Judge Walton in

20   a case that I believe is against Defendant Smith -- and I'm

21   sorry I don't have the exact cite, but I -- he relied on the

22   *Little* decision in imposing a split sentence in that case.

23        And I did have a sentencing hearing before Judge Moss

24   where he referenced but didn't rely upon the *Little* decision,

25   much as Your Honor has done here.  He engaged in his own

1    statutory construction and analysis and decided that it was

2    within his authority to impose a split sentence.  However, at

3    the time -- and it was a case against Micajah Jackson, and the

4    cite on that one is 21-cr-484.  And, again, that was

5    Judge Moss.

6         He said that he would -- he agreed with Judge

7    Little's [sic] ultimate conclusion that they were authorized

8    but -- but didn't end up imposing one, much like Your Honor did

9    with *Conover*.  He imposed a halfway house sentence in that case

10   for various other factual reasons that were present in that

11   case.

12        So just to add Judge Walton and Judge Moss to the -- to

13   the world of judges that have agreed that -- that split

14   sentences are authorized.

15             THE COURT:  Okay.  Thank you.

16        All right.  And so the Court has considered the briefing

17   in this matter and everything that's been submitted by the

18   parties and their arguments.  And I interpret the relevant

19   statute to permit the imposition of a split sentence for a

20   crime of conviction that is a petty offense.

21        I adopt the reasoning and the ruling in *United States v.*

22   *Little*, 21-cr-315, where Judge Lamberth issued a memorandum of

23   opinion that squarely addressed this issue.

24        Independently, I think the best reading of

25   18 U.S.C. § 3561(a)(3) is that the phrase, quote, that is not a

1   petty offense, unquote, modifies the full phrase, quote, the

2   same or a different offense, unquote.  That's the most

3   grammatically correct reading, as well as the reading that

4   makes the most sense substantively.

5        The defense has argued that the words "the same" in the

6   second phrase under section (a)(3) modifies the word "offense"

7   that is three sections above, under the -- I think they call it

8   the prefatory phrase -- under subsection (a).  And to me that

9   really makes no sense grammatically when the word "offense"

10  appears three words later within the same subsection of the

11  statute.  I think the word "the same" -- the second word "the

12  same" in subsection (3) modifies the word "offense," which is

13  three words -- or, I guess, four words later; meaning, it's the

14  same or a different offense that is not a petty offense.  That

15  it makes the most sense.  And I just think, substantively, it

16  also makes the most sense.

17       Because what this interpretation does, the

18  interpretation adopted in *Little*, is it allows split sentences

19  for petty offenses.  And the reason for that -- and there's

20  legislative history to support this -- is that -- that

21  supervised release is not available for petty offenses.  It is

22  available for other types of offenses.  And so to allow

23  probation in split sentences for petty offenses allows

24  supervision after a term of incarceration, which otherwise

25  would not be available, even though that is available for

1    felony offenses where you can have a term of imprisonment

2    followed by supervised release.  And so I think that makes

3    sense.

4         In trying to play out the implications of the defense's

5    proposed interpretation in *Caplinger*, I'm not able to figure

6    out a way in which that makes any sense substantively; that one

7    would require two petty offenses in order to give a

8    probationary offense -- I'm sorry, probation sentence or a

9    split sentence in the petty offense context.  It just doesn't

10   make sense to me.  And I was trying to reason it out with

11   Ms. Jahn.  And I still don't know how that makes any sense.

12        And so, therefore, I think both grammatically and

13   substantively, the best reading is that adopted in *United*

14   *States v. Little*.  And I'll note too that this interpretation

15   is reconcilable with 18 U.S.C. § 3551(b), which does explicitly

16   state that, in general, a sentence of probation and a sentence

17   of imprisonment are mutually exclusive.  And it's reconcilable

18   because § 3561(a)(3) is a more specific statute that creates an

19   exception to the general rule that is expressed under section

20   3551(b).  And so I rule that it is permissible to impose a

21   split sentence for a crime of conviction that is a petty

22   offense.

23        Okay.  So in light of that ruling, I'll hear allocution

24   from the parties, and I'll hear first from the government.  And

25   I'll note I have read all your papers, but I'm interested in

1      hearing anything you wanted to highlight.

2              MR. MURPHY:  I'll start off the recommendation by

3      repeating the -- the government's specific recommendation

4      that -- specifically, that the -- that the defendant be

5      sentenced to a split sentence of 105 days' incarceration or

6      approximately 3 and a half months, followed by 3 years of

7      probation, 60 hours of community service, and $500 in

8      restitution.

9          The key reasons for this recommendation are, as listed

10     in the government's sentencing memorandum, first, that he

11     entered the Capitol twice, despite being forced out the first

12     time by police officers, and videotaping rioters who were at

13     the time looting the Senate parliamentarian's office.

14         Second, he entered into two private office spaces, also

15     known as -- and referred to across this memorandum and other

16     memoranda as sensitive spaces.  Specifically, the Senate

17     parliamentarian's office and Oregon Senator Jeff Merkley's

18     office during the two breaches of the Capitol.  And, notably,

19     he entered one sensitive space the first time and another

20     sensitive space the second entry, which was via the Senate wing

21     door.

22         Third, he filmed the video of himself in the northwest

23     plaza.  Again, notably, after he had already entered and been

24     forced out of the Capitol, entered a sensitive space, and

25     seeing the destruction and looting and misbehavior that was

1    going on in there.  And in that video, he yelled to -- to the

2    world, "Why can't you people just do what we want?  Why do you

3    got to make it so hard?  Why do you take our money and use it

4    for nefarious purposes?"  He goes on beyond that, and the full

5    quote is included in the various government filings.

6          The fourth reason is that while he was in the Capitol,

7    again, he provided narration to his videos, most of which was

8    directed at his mother who -- I want to be clear -- was not at

9    the riot, and it's my understanding also that it was not a

10   livestream situation.  It was him recording a video that he

11   then anticipated later showing to his mother -- or sending to

12   his mother.

13         But in one specific video, he stated, "We can't let

14   Biden be our President.  We can't.  There's no way."  And he

15   said that while he was in the Capitol, specifically, the crypt,

16   which is right below -- it's the -- literally, the center of

17   Washington, D.C., and also the Capitol.

18         Fifth and finally, Entrekin, the defendant in this case,

19   has a criminal history which includes a nonviolent conviction

20   from 2000 where he served a 3-year term of probation, and a

21   conviction for threatening and intimidating from 2015 for which

22   he also -- well, for which he was notably sentenced to a split

23   sentence of 105 days' incarceration split with a 3-year term of

24   unsupervised probation.

25               THE DEFENDANT:  Excuse me.

1          THE COURT:  Can I ask, where do you get 105?  Because

2     I think the PSI says it was 180 days, execution suspended as to

3     all but 60.

4          MR. MURPHY:  You're correct, Your Honor.  What --

5     what happened -- and I apologize for not catching this sooner.

6     As -- it was an error made when I used the control-F function

7     to change the number of days as to the recommendation in this

8     case, and it inadvertently changed that as well, but the Court

9     and Mr. Entrekin are absolutely right; that it was 60 days.

10    And I apologize for the -- for the error in that paragraph.

11         THE COURT:  And so why did you -- why are you

12    recommending 105?  That's kind of a different number.

13         MR. MURPHY:  It is a bit unusual.  And it's crafted

14    with the idea of consistency and balancing other sentences of

15    other defendants in these cases; specifically, the cases that

16    are cited by the -- in the sentencing memorandum.  I apologize.

17    Just one moment.

18         So with regards to specific cases that seem to be

19    generally applicable or similar to Mr. Entrekin's, Derek

20    Jancart and Erik Rau, 21-cr-148 --

21         THE COURT:  I'm sorry.  Where are you looking,

22    Mr. Murphy?  You're looking at the chart in your memo?

23         MR. MURPHY:  In my memo on page 38.

24         THE COURT:  All right.

25         MR. MURPHY:  In the case of Jancart and Rau, the

1   defendants pled guilty to misdemeanor charges, like this

2   defendant, and they both received sentences of 45 days'

3   incarceration.   The sensitive space that they entered into

4   was -- was Speaker Pelosi's conference room.

5           Another defendant, Gracyn Courtright, whose case is

6   under 21-cr-72, actually reached the Senate floor.  She appears

7   to not have known where she was, however, and received a

8   sentence of 30 days' incarceration with 1 year of supervised

9   release.

10          THE COURT:  So, Mr. Murphy, am I missing something?

11  Like, how does this support your recommendation of 105?

12          MR. MURPHY:  The -- so that is due to a balancing of

13  the individual aggravating factors.  Some other defendants who

14  have just pled to -- or I'm sorry, who -- whose aggravating

15  factors include entering a sensitive space, the recommendation

16  may be lower.  For others who -- who stayed within the Capitol

17  but may have had a previous criminal record, the sentence may

18  be another thing.

19          It's -- and Judge Cooper used this phrase previously in

20  a sentencing that I had before him, but it's -- these

21  sentencings are more of an art than a science.

22          But in -- it's Mr. Entrekin's specific and unique

23  combination of aggravating factors.  Specifically, that he does

24  have prior criminal offenses for which he has already served

25  probationary sentences.  It's the fact that he -- as can be

1    shown by the government, Video Exhibit 2, when he was on the

2    west lawn.  And contrary to the claims that he -- he makes in

3    his letter to Your Honor, that they had no idea what they were

4    doing and he was just kind of going with the flow.  I think he

5    compared it to a -- a collegiate sporting event where people

6    are trying to rush the field.

7         I mean, Government's Exhibit 2 makes it pretty clear, as

8    well as the defendant's own video, that -- like what they were

9    there for, the kind of people they were looking out for to

10   support them in their cause, and you can hear the flash-bangs

11   going off.  You can see the -- the plumes of smoke from either

12   smoke devices or chemical irritants that are being deployed by

13   some party in -- in -- on the west lawn to try and push the

14   rioters back, and yet he continued onward.

15        The fact that he went inside the Capitol once and almost

16   immediately was met by -- you know, luckily the law enforcement

17   officers, the police officers, had blocked the

18   parliamentarian's hallway and were able to get most of them

19   back before they were able to penetrate further into the

20   Capitol; with what the defendant recorded himself and in his

21   video can be heard and he describes as machine gun Tasers.

22        He pokes his head into the parliamentarian's office.  He

23   sees the looting, and he expresses what seems to be sincere

24   shock and -- and terror at -- at what he sees, which is good,

25   because the state of destruction of the parliamentarian's

1    office was -- was, indeed, very shocking; with the papers

2    strewn about, people seated at desks with their feet up on the

3    desks, broken windows.

4         But once he gets out, he doesn't leave.  He stays there

5    on the northwest plaza and waits for the next -- for the

6    ability to enter the next breach point that was available to

7    him, which is the Senate wing door.  He goes in there --

8         THE COURT:  Mr. Murphy --

9         MR. MURPHY:  Yes, Your Honor.

10        THE COURT:  -- has anybody gotten 105 days for

11   conduct similar to what Mr. Entrekin has done?

12        MR. MURPHY:  I'm unsure of anybody receiving that

13   exact number, but I'm also unsure of anyone who has this exact

14   combination of -- of aggravating factors and -- and behavior.

15        THE COURT:  Okay.  All right.  Because I started this

16   by asking you how did you come up with 105, which is an odd

17   number, and doesn't seem like anybody else got that much.  And

18   what you point to, they've gotten less than half that much.

19        MR. MURPHY:  Yes, Your Honor.  If I could have just a

20   moment to pull up my notes on -- in this case.

21        THE COURT:  I wanted to ask you too, Mr. Murphy, the

22   video clips you submitted, none of them are from the

23   closed-circuit cameras from within the Capitol.  It's almost --

24   it's exclusively from other sources, including Mr. Entrekin's

25   own phone.  And I was wondering why that is.

1          MR. MURPHY:  That's correct, Your Honor.  And that

2     was a decision that -- that I made because of the use of clips

3     from the -- the closed-circuit video throughout the

4     government's filings and -- including the sentencing

5     memoranda -- there are large portions of that dedicated to the

6     screenshots.  And I realized that videos are -- provide more --

7     more than a screenshot.  But what I wanted to emphasize through

8     the -- through the use of -- specifically, the defendant's own

9     videos, which is the -- Government's Exhibit 1, was the -- not

10    just the sight but the sound and his own narration of the

11    events as they were occurring.

12         THE COURT:  Well, I infer, though, from the lack of

13    any video from the CCTV that there isn't any video of him, I

14    guess, confronting police officers, doing any -- being along

15    the front lines, anything of that nature.  So I just want you

16    to confirm that's true.

17         MR. MURPHY:  Yes, Your Honor.  There is no evidence

18    that I'm aware of in which the defendant in this case

19    specifically confronted police officers, law enforcement,

20    engaged in any direct destruction of property or vandalism

21    or -- or theft.

22         THE COURT:  Or even pushed along with the crowd past

23    law enforcement?  It doesn't seem like there's anything like

24    that.

25         MR. MURPHY:  The only thing that -- that tends to

1    support an inferral of pushing is in his first cell phone video

2    from Government's Exhibit 1 when he takes a moment to --

3    towards the latter half of that clip and says, "Okay.  We're

4    pushing now.  We're pushing."

5                THE COURT:  That's outside, though?

6                MR. MURPHY:  That was outside, yes.

7           When he was in the parliamentarian's door and the crowd

8    was moving in, he did appear to be moving with the flow of the

9    crowd.  And when he was moving out, there was a logjam of folks

10   trying to get out of the Capitol, but -- but, no, I -- I don't

11   know of any instance where he's directly confronting or

12   pushing -- kind of engaged in the heave-ho of protesters

13   against a line of law enforcement.

14               THE COURT:  The other thing I wanted to ask you,

15   Mr. Murphy, is you didn't reference mental health treatment in

16   your recommended conditions of probation.  What's your position

17   on that?  Because I -- I think this was an oversight on my

18   part.  But I saw in a prior pretrial services report that the

19   defendant was evaluated for mental health services and it was

20   recommended for him.  And I just -- I only had one hearing with

21   him, his plea hearing, since that report, and I have must

22   overlooked that, because I didn't order it.  And I think that

23   might be appropriate as a condition of probation.

24               MR. MURPHY:  And if -- if my memory serves me, we --

25   we actually did address that, I think, at the hearing.  I had

1    conferred with Mr. Vanegas, who was the counselor at the time,

2    and Your Honor did ask us if we were recommending it.  And

3    based on the representations that Mr. Vanegas had made to me

4    and my understanding it, that mental health treatment was not

5    something that -- that either party was requesting at the time.

6    And I believe Your Honor said something to the effect of --

7    that we can reevaluate at -- at sentencing if it comes to that.

8         So as to the government's specific recommendation as to

9    sentencing, no, I didn't include that in the sentencing

10   memoranda -- sentencing memorandum.  However, given that

11   pretrial has evaluated him for it and does seem to think it

12   would be appropriate and we are now at the sentencing stage, if

13   anything, I would recommend that he -- if that recommendation

14   still stands, that be -- that be made a condition of his

15   probation.

16        THE COURT:  Okay.  Thank you.  Thank you for

17   reminding me of what happened at that hearing because I didn't

18   recall the contours of that.  I'm glad that we at least

19   discussed it.  It seems like we have more information now based

20   on the presentence report that weighs in favor of imposing

21   that, but I want to hear from Ms. Jahn on that as well.

22        So I guess the only other -- the final thing is just if

23   you have anything else to add about why 105; otherwise, I'm

24   going to move on to Ms. Jahn.

25        MR. MURPHY:  Yes, Your Honor.  As to why the 105, I

1   would -- I know it wasn't included in the sentencing

2   memorandum, but I do want to draw the Court's attention to the

3   fact that many of the video exhibits, which I found after the

4   sentencing memorandum was filed and are open-source videos,

5   show that even after being pushed out of the Capitol -- or --

6        I do want to make note of this because the defendant in

7   his letter does say that immediately he felt the need to exit.

8   He doesn't necessarily say which -- and that's on his letter,

9   which is 27-2 on page 2 of 3.  That doesn't take into

10  consent -- into consideration the fact that he entered the

11  Capitol twice, and that in his own video, specifically

12  Video No. 8 of the government's exhibits, right towards the end

13  of that video, he states -- well, another protester says,

14  "Antifa never did this shit."  To which the defendant replies,

15  "Nope, nope.  That's true.  That's true.  Nope.  You're right.

16  All right.  I guess with respect to the people that are coming

17  in, I got to get out.  We got more people who want to come in.

18  We got to respect that too, you know."

19       Then he goes on to say that he's glad they're not doing

20  rubber bullets anymore and he should have brought that --

21  bought that centurion helmet after all.  So that -- that sits

22  in contrast to his statement that he was sorrowful and felt the

23  need to go.

24       If anything, the -- his own stated reason for needing to

25  go the second time was to let other people in and his only

1      regret was he hadn't brought more personal armor or protection.

2              Then after he left the Capitol that second time, again,

3      he didn't go home.  He went around to the east side of the

4      Capitol.  And this is -- and I'm sorry for the incongruous

5      nature of my comments, but he -- this is when he got to the

6      media staging.  And as the videos show, he stood there smiling,

7      holding his -- his title of liberty over the destruction of the

8      media equipment that was there.

9              But even after he left that, he didn't go home or leave

10     the restricted grounds.  Still, he walked around and can be

11     seen in the background of other videographers.  He gives

12     another interview on the east front of the Capitol where he

13     continues to double down on his claims to be representing

14     Captain Moroni and comparing the leaders of the government to

15     the king-men, individuals who Captain Moroni killed if -- if

16     they didn't agree with him.  And he continued that up until the

17     end of the time that he was on restricted grounds.

18             And then there's another picture in the sentencing

19     memorandum where he can be seen in front of another court

20     building in D.C.  And from the lights -- I know it's

21     monochrome.  I think it's Image 4 in the government's filing.

22     But it's nighttime, and he's still there, still dressed as

23     Captain Moroni, still in his complete costume, walking around,

24     just looking for opportunities to be photographed.

25             So that -- the only reason I point that out -- of

1   course, he has every right to wear whatever he wants on

2   whatever street in Washington, D.C., but the only reason I

3   point that out is because it sits in contrast to his claims of

4   sorrow and -- and shock that he presents in his letter to the

5   Court.  And -- and the government asks the Court to consider

6   those claims appropriately in light of that evidence.

7           THE COURT:  Okay.  Thank you, Mr. Murphy.

8       Ms. Jahn.

9           MS. JAHN:  Yes, Your Honor, and I'll be brief.

10          This is a situation where Mr. Entrekin was inside the

11  building for approximately 13 minutes.  As the government just

12  told you, there's no evidence that he engaged in any violence,

13  that he engaged in any contact with law enforcement, that he

14  did anything nefarious once inside the building compared to

15  many, many others.  The government has just indicated and

16  highlighted to you that Mr. Entrekin expressed shock and dismay

17  when observing the destruction of -- of particular offices.  He

18  was in no way, shape, or form a part of that destruction.

19          Being outside, standing on a street corner, hours after

20  the events, as depicted in Image 4, respectfully, have nothing

21  to do with the criminal conduct in this case.  The fact that he

22  was still there does not indicate that he is not remorseful or

23  that he is not sorry for his participation in unlawfully

24  entering the Capitol Building earlier that day.  As we know, he

25  arrived from Arizona.  So, surely, it wasn't going to be a

1      situation where he immediately left.

2             But what the situation was is that when he did get back

3      to Arizona, he met with the FBI at his home.  He admitted to

4      his conduct.  He turned over his telephone.  And as I think you

5      pointed out, Your Honor, the majority of the evidence in this

6      case against Mr. Entrekin is from his own telephone, compared

7      with many other individuals who did not agree to turn over

8      their telephones, did not provide admissions with regard to

9      their conduct.  Mr. Entrekin did that.

10            Once the case was officially filed, which there was some

11      months in between his admissions to the FBI and filing,

12      Mr. Entrekin has done everything in his power to resolve the

13      case quickly, admit his conduct, and ultimately asks for

14      forgiveness and is remorseful in his letter.  How someone acts

15      on a particular event or engaging in conduct does not mean they

16      can't be remorseful in the future upon reflection and thinking

17      about the gravity of the situation; which, clearly, I think

18      Mr. Entrekin tried to describe why he dressed in the manner

19      that he did, what his intent for going was.

20            And in all candor, I think he got caught up.  I'm not

21      excusing behavior.  I am not trying to say -- or negate his

22      criminality, but it should be looked at in the context of his

23      involvement on that particular day.  And I think he tries his

24      best to explain that in his letter to you, Your Honor.  And so

25      I think the level of remorse and sincerity is true and valid in

1    this particular instance.

2         And, notably, as you've inquired on a couple occasions

3    as to why the government is asking for 105 days, the defense,

4    respectfully, submits that that request would result in an

5    unwarranted sentencing disparity for similarly situated

6    defendants.  The government's own cases in which they rely upon

7    that I cite in my reply, the maximum period of jail was

8    45 days.

9         And the facts of those cases are dramatically different,

10   so much more so that -- the matter in front of Judge Cooper,

11   Ms. Courtright, she was on the Senate floor carrying property

12   of the United States.  And for reasons that I don't understand,

13   she was afforded a misdemeanor plea offer -- not this parading

14   offense -- another misdemeanor plea offer and was given a

15   sentence of 30 days.  Frankly, I think one could glean that

16   that conduct is in stark contrast to the conduct of

17   Mr. Entrekin, as he did not enter the Senate gallery, he did

18   not attempt to take any items that were in the possession of

19   the U.S. Capitol or any government official.

20        And he has been nothing but cooperative and providing

21   information about his own wrongdoing at every stage of the

22   case.  And so for all of these reasons, Your Honor, we believe

23   a probationary sentence is appropriate.

24        If the Court is inclined to impose additional sanctions

25   other than the restrictions afforded to someone who is on

1    probation, we are asking that the Court consider a period of

2    home detention or home incarceration.  As you know from the

3    letters, he cares for his mother who has her own medical

4    issues.

5        Mr. Entrekin has been compliant and very communicative

6    with his pretrial services officer, as articulated in the

7    report that was submitted to you yesterday, Your Honor.  And so

8    he's an excellent candidate and has demonstrated that he

9    communicates well with an officer of the court.  In this

10   instance, his pretrial officer.  And so we submit that any

11   confinement, if the Court is so inclined, should be done in his

12   home so that he can provide for himself and his mother,

13   Your Honor.

14        THE COURT:  Ms. Jahn, what is your position on mental

15   health services?

16        MS. JAHN:  Your Honor, I understand there was an

17   assessment done.  That was completed.  I recognized there --

18   there is an issue in terms of family background.  Mr. Entrekin

19   is not opposed to an additional assessment.  I think the

20   request would be if the Court's so inclined as a condition of

21   probation to request an assessment and if that provider then

22   deems appropriate treatment necessary, that would be

23   appropriate.  But, frankly, I don't know if the treatment

24   provider will say it's necessary for further treatment.

25        THE COURT:  Seems like the last evaluation did

1   recommend further treatment, and I think that there's evidence

2   in this record related to his last conviction that suggests

3   that it would be appropriate.

4           MS. JAHN:  It did, Your Honor.  I inquired about that

5   with his pretrial services officer.  And it was startling to me

6   that a 40-minute interview was done and there was an indication

7   of future treatment as necessary.  And the record seems

8   somewhat void, frankly, of the reasons why, because I know that

9   additional information wasn't even ascertained for Mr. Entrekin

10  about family history and the like.

11          And so that's why, respectfully -- every jurisdiction

12  does things differently, but if the Court is so inclined, I

13  would just ask there be an assessment and then if it's deemed

14  appropriate, follow-up treatment and evaluation.

15          THE COURT:  All right.  Thank you.

16          Mr. Entrekin, is there anything that you would like to

17  say before I sentence you?

18          I think you're still muted, Mr. Entrekin.

19          THE DEFENDANT:  Sorry.

20          I just -- I'm very deeply regretful for entering the

21  Capitol Building.  I was there, of course, as I have written

22  and expressed, that I was there to, with the others, protest

23  the election results, which I still believe were tampered,

24  which -- I am regretful for entering the Capitol Building and

25  very regretful that I saw the destruction that I saw.

1        After leaving the Capitol, I -- despite what it

2     appeared, I was very -- it was -- it was very solemn for me,

3     despite my towing around that -- that big flag and, you know,

4     putting up a smile or two.  Inside, I -- I knew at a

5     fundamental level that the people that had broken in and

6     allowed for us to come in, that was wrong.  And my coming in

7     afterwards, hence, was also wrong.

8        And I'm -- I am very sorry to have -- very sorry to have

9     entered into the Capitol.  By the time I moved forward -- at

10    any time, it would seem that whatever barricades there were,

11    they were removed, and I had no -- really, I had not much

12    thought of -- of -- of barricades and things because I was

13    caught up in -- in the -- in -- in that moment.  And in

14    retrospect, I am sorry because I realize it was restricted

15    and -- it was a restricted area and that proceedings of

16    Congress were going forth -- attempting to anyway.

17       And I -- I should have just stayed out on the lawn and

18    did what I came there to do, which was to -- to portray the

19    character in -- in the book of my belief, my -- my church, and

20    the -- some of the analogy that was there, which, clearly, I do

21    not condone any killing of any sort or any -- any type of

22    violence.

23       The domestic violence case that I had in 2015 was a

24    culmination of a neighbor that was -- what I believe was

25    participating in -- what I was researching on the internet is

1    called directed energy weaponry and electronic harassment.  And

2    this is the stuff for the three-letter -- the three-letter

3    agencies.  But I -- I've just -- I've seen a lot of things

4    where there have been goings-on with NSA, CIA, and so forth.

5    You could easily, you know, kept that as, you know, this guy

6    is -- is mental or not.  But there -- there were situations

7    where -- basically, it just came to a head.  And -- and I said

8    things completely that I would never have said.  And that's the

9    record that stains, obviously, my past, and I'm regretful for

10    that also.

11         But today I am saying that I regret ever entering the

12    Capitol Building.  There -- there were much better things that

13    I could have participated in than that.  And that's all --

14              THE COURT:  Okay.  Thank you.

15              THE DEFENDANT:  -- I have to say.

16              THE COURT:  All right.  Thank you.

17         The gravity of the crimes committed on January 6th,

18    2021, cannot be overstated.  An uncontrollable mob assaulted

19    our democracy and violently disrupted the peaceful transfer of

20    power after a free and fair election.  They swarmed the

21    United States Capitol and overwhelmed law enforcement officers

22    who tried to maintain order.  And they did so with the intent

23    to subvert the will of the American people and to, essentially,

24    overthrow the democratically elected government.

25         Mr. Entrekin was not one of the leaders of the mob, and

53

1    he did not engage in acts of violence or destruction of

2    property, but he unquestionably shared the goal of stopping the

3    peaceful transfer of power, of blocking the certification of

4    the election results.  He stated on that day, quote, We can't

5    have Joe Biden as President, unquote.

6         He stands before the Court convicted of a Class B

7    misdemeanor, a petty offense, with a maximum penalty of six

8    months' imprisonment, a $5,000 fine, and five years of

9    probation.  Mr. Entrekin is entitled to be sentenced based on

10   his individual conduct, but it must be viewed in the context of

11   that dark day.  And it must take into consideration the

12   relevant sentencing factors under 18 U.S.C. § 3553(a).

13        I have considered all of those factors, but I focus on

14   the following:  First, the nature and circumstances of the

15   offense.  Mr. Entrekin drove to Washington from Cottonwood,

16   Arizona, to protest Congress's certification of the results of

17   the 2020 presidential election.

18        He was part of that mob that swarmed the Capitol.  He

19   entered the building not once but twice, and he spent a total

20   of about 13 minutes inside.  I think it is significant that he

21   entered twice because there can be no doubt that after he

22   entered the first time, he was aware of what was going on

23   inside the building, which was that the unruly mob was

24   overwhelming the building and engaging in acts of destruction

25   and some acts of violence.  Yet, he chose to go back inside.

1     He also made his way to private areas of the building,

2   including the parliamentarian's office and Senator Jeff

3   Merkley's office.  And while he was at the Capitol, he filmed

4   the events and expressed his desire to overturn the election.

5   He explicitly stated, "We can't let Biden be our President.  We

6   can't.  There's no way."

7     His actions were not violent, and he did not directly

8   confront law enforcement officers.  He did seem to want to

9   avoid that, but he lent his presence and his support to the

10   group effort to swarm the building.  The aggregate goal of

11   breaching the Capitol could not have been achieved without the

12   individual participation of people like Mr. Entrekin.

13     His attitude that day betrayed no realization or

14   understanding of how serious and dangerous the situation was

15   that day.  He cheerfully narrates events to his mother despite

16   his awareness that violence and destruction were taking place

17   all around him.  He discusses riot police, rubber bullets,

18   machine gun Tasers.  He filmed the destruction of media

19   equipment.  Yet, he laughs when he says things like, "Where's

20   my ice cream, Nancy?  I want my ice cream," referring to the

21   Speaker of the House.

22     I'm also to consider the history and characteristics of

23   the defendant.  The defendant is 49 years old, and he's well

24   educated.  He received a college degree in fine art studies

25   from the University of Arizona and a master's of education in

1    educational technology with distinction from Northern Arizona

2    University in 2013.  He's also an Eagle Scout.  He lives with

3    his mother and enjoys a close relationship with her, and she

4    wrote a letter about how much she relies on him to take care of

5    her.  He's been employed in a variety of positions, including

6    as a substitute teacher, in ride-sharing, in freelance graphic

7    arts, and as a notary public.

8         He wrote a letter to the Court and addressed the Court

9    today expressing his remorse, which I think is sincere,

10   although I note that what he has said is somewhat contradicted

11   by some of the evidence in this case.  Mr. Entrekin, for

12   example, said this was a solemn event for him, but that does

13   not square with him laughing and shouting, "Where's my ice

14   cream, Nancy," inside of the Capitol Building.  But I do

15   believe that he's now remorseful.

16        Mr. Entrekin has been evaluated for mental health

17   services by pretrial services, and those services have been

18   recommended for him.  And I think this is an important

19   consideration which weighs in favor of the somewhat lower

20   sentence, and I have taken that into account.

21        Finally, he does have two prior convictions.  One is a

22   2001 misdemeanor conviction for criminal copyright infringement

23   for which he received three years' probation and paid $2700 in

24   restitution.  I note that he successfully completed probation,

25   which was terminated early in that case.

1        The other is a 2015 conviction for threatening and

2   intimidating, and it arises from an incident in which he made

3   verbal threats to kill his neighbors.  He was sentenced to

4   180 days and served 60 and, again, received 3 years' probation.

5   And these are circumstances which do appear to evidence a need

6   for mental health services, as noted in the presentence

7   investigation report and comments made by his mother, among

8   others.  I note also that he has a number of traffic offenses,

9   but I do not assign any weight to those.

10       Finally, I'll note the need to avoid disparity in

11   sentencing.  I have reviewed the sentences imposed on other

12   defendants who have pled guilty of misdemeanor charges in

13   relation to the January 6th events.  I'm confident that the

14   sentence I intend to impose is well within the range for cases

15   of this nature, and I note, in particular, that this particular

16   defendant has two prior convictions, while many other

17   misdemeanor defendants who receive probationary sentences

18   appear to have had no criminal record.

19       This sentence is particularly intended to deter

20   Mr. Entrekin and others from engaging in this type of conduct,

21   for he does not seem to have understood the seriousness of his

22   actions, and there may be others too who don't understand the

23   gravity and danger of engaging in this type of mob activity

24   with the intent to, essentially, overthrow our government.

25       So, Mr. Entrekin, I'm going to sentence you as follows:

1    Pursuant to the Sentencing Reform Act of 1984 and in

2    consideration of the provisions of 18 U.S.C. § 3553, it is the

3    judgment of the Court that you, Nathan Wayne Entrekin, are

4    hereby committed to the custody of the Bureau of Prisons for a

5    term of 45 days on Count 5.  You're further sentenced to serve

6    a term of 36 months, or 3 years, of probation on Count 5.  In

7    addition, you are ordered to pay a special assessment of $10 in

8    accordance with 18 U.S.C. § 3013 and restitution in the amount

9    of $500.

10        While on supervision, you shall abide by the following

11   mandatory conditions, as well as the standard conditions of

12   probation, which are imposed to establish the basic

13   expectations for your conduct while on supervision.

14        The mandatory conditions include:  No. 1, you must not

15   commit another federal, state, or local crime; No. 2, you must

16   not unlawfully possess a controlled substance; No. 3, you must

17   refrain from any unlawful use of controlled substances.  You

18   must submit to one drug test within 15 days of placement on

19   supervision and at least two periodic drug tests thereafter as

20   determined by the Court.

21        You must make restitution of $500 in accordance with

22   18 U.S.C. §§ 3663 and 3663(a) or any other statute authorizing

23   a sentence of restitution.  The Court authorizes supervision of

24   this case to be transferred to the United States District Court

25   for the District of Arizona.  That is supervision only, not

1   jurisdiction.

2       You shall comply with the following special conditions:

3       Community service.  You must complete 60 hours of

4   community service within 24 months.  The probation officer will

5   supervise the participation of the program by approving the

6   program, and you must provide written verification of completed

7   hours to the probation officer.

8       Mental health.  You must cooperate with a mental health

9   assessment or evaluation.  If mental health treatment is

10  recommended, you shall participate in a mental health treatment

11  program and follow the rules and regulations of that program.

12  The probation officer, in consultation with the treatment

13  provider, will supervise your participation in the program,

14  including the provider, location, modality, duration, and

15  intensity.

16      The Court finds that you do not have the ability to pay

17  a fine and, therefore, waives imposition of a fine in this

18  case.  You are ordered to make restitution to the Architect of

19  the Capitol in the amount of $500.  The Court determines that

20  you do not have the ability to pay interest and, therefore,

21  waives any interest or penalties that might accrue on the

22  balance.  Restitution payments shall be made to the Clerk of

23  the Court for the United States District Court, District of

24  Columbia for disbursement to the following victim:  The

25  Architect of the Capitol, Office of the Chief Financial

1    Officer, Attention:  Kathy Sherrill, Ford House Office

2    Building, Room H2-205B, Washington, D.C., 20515.

3        There may be a financial payment schedule.  Having

4    assessed the defendant's ability to pay, payment of the

5    restitution is due as follows:  payment in equal monthly

6    installments of $50 to commence 30 days after the date of this

7    judgment.

8        The final obligations are payable to the Clerk of the

9    Court for the -- the financial obligations are payable to the

10   Clerk of the Court for the U.S. District Court, 333

11   Constitution Avenue, Northwest, Washington, D.C. 20001.  Within

12   30 days of any change of address, you shall notify the Clerk of

13   the Court of the change until such time as the financial

14   obligation is paid in full.

15       The probation office shall release the presentence

16   investigation report to all appropriate agencies, which

17   includes the United States Probation Office in the approved

18   district of residence, in order to execute the sentence of the

19   Court.  Treatment agencies shall return the presentence report

20   to the probation office upon the defendant's completion or

21   termination from treatment.

22       Notice of appeal.  Pursuant to 18 U.S.C. § 3742, you

23   have a right to appeal the sentence imposed by this Court if

24   the period of imprisonment is longer than the statutory

25   maximum.  If you choose to appeal, you must file any appeal

1    within 14 days after the Court enters judgment.

2         As defined in 28 U.S.C. § 2255, you also have the right

3    to challenge the conviction entered or sentence imposed if new

4    and currently unavailable information becomes available to you

5    or on a claim that you have received ineffective assistance of

6    counsel in entering the plea of guilty to the offense of

7    conviction or in connection with sentencing.  If you are unable

8    to afford the cost of an appeal, you may request permission

9    from the Court to file an appeal without cost to you.

10         Are there any objections to the sentence imposed that

11   are not already noted on the record?

12         Ms. Jahn?

13         MS. JAHN:  No, not already noted.

14         But I do have a query with regard to the payment plan.

15   I believe you said $30 a month to begin in 30 days.  I would

16   ask for the Court to reconsider that in light of the jail

17   sentence you have imposed, to then commence upon completion of

18   his jail sentence, perhaps modifying the same language against

19   that.

20         THE COURT:  Thank you.

21         I said $50 to commence 30 days after the date of

22   judgment.  I will amend that to say $50 to commence 30 days

23   after release from incarceration.

24         MS. JAHN:  Thank you, Your Honor.

25         And one other request in terms of a recommendation for

1   placement at a facility.  I would ask that it be as close to

2   his home residence in Arizona as possible.

3              THE COURT:  Okay.  We'll make that recommendation to

4   the board -- the Bureau of Prisons.  We'll recommend a facility

5   as close as possible to his home.

6         Anything from you, Mr. Murphy?

7              MR. MURPHY:  No, Your Honor.  Thank you.

8              THE COURT:  All right.  Mr. Entrekin, that is the

9   judgment of the Court.

10        I want you to know that I spent a lot of time thinking

11   about your sentence and tried to weigh all the different

12   factors that were before me.  I hope that you can do better

13   going forward, and I wish you the best of luck.

14             THE DEFENDANT:  I will.  Thank you, Your Honor.

15             THE COURT:  All right.  Thank you.

16        Parties are excused.

17             (Proceedings were concluded at 12:53 p.m.)

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3             I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 13th day of June, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25